**OGDEN ENVIRONMENTAL SERVICES, Plaintiff,**

v.

**CITY OF SAN DIEGO; City Council of the City of San Diego; Maureen O'Connor, Abbe Wolfsheimer, Gloria McColl, Ed Struiksma, Bruce Henderson, Ron Roberts, and Bob Filner, as Members of the City Council of the City of San Diego, Defendants.**

Civ. No. 88–0252–K(M).

United States District Court,
S.D. California.

June 7, 1988.

David L. Mulliken, Kristine L. Wilkes, Latham & Watkins, San Diego, Cal., for plaintiff.

C. Alan Sumption, Chief Deputy, City of San Diego, Litigation Div., San Diego, Cal., for defendants.

## AMENDED MEMORANDUM DECISION AND ORDER

KEEP, District Judge.

This action arises out of the City of San Diego's ("City") denial of a conditional use permit to plaintiff Ogden Environmental Services ("Ogden"). In this motion, plaintiff moves for summary judgment on most of the causes of action in its complaint.

This order addresses plaintiff's first cause of action for federal preemption, its fifth cause of action for violation of the California Environmental Quality Act and its twelfth cause of action for declaratory relief. Because a ruling on plaintiff's remaining causes of action would not provide plaintiff with any additional or different relief, the court declines to address these claims. For the reasons discussed below, the court grants plaintiff's motion for summary judgment on the first and fifth causes of action. The court also grants in part and denies in part plaintiff's motion for summary judgment on the twelfth cause of action for declaratory judgment.

FACTS [1]

Plaintiff Ogden is a corporation involved in the development of new technologies for hazardous waste treatment. For the past few years, Ogden has been engaged in an attempt to obtain permission from various relevant public agencies to begin operating an incineration facility that will burn hazardous materials. The incinerator, known as a Circulating Bed Combustor, is located within an existing research facility owned by GA Technologies on the north side of Genesee Avenue between John J. Hopkins Drive and Interstate 5 within the City of San Diego. Since 1964, this area has been designated by the City as a Scientific Research Zone, which is designed to encourage research and development activities and was intended to replace the conditional use permit procedure for this area.

In July, 1985, GA Technologies, from whom plaintiff Ogden subsequently pur-

1. Defendants object to the exhibits submitted by plaintiff in connection with this motion, arguing that they are not properly authenticated or constitute hearsay. Although the court does not rely on all the exhibits submitted in ruling on this motion, I find that defendants' objections are without merit at least as to those exhibits that are relied upon. Because there are so many exhibits, rather than go through an analysis of the admissibility of each, I note that I have considered defendants' general objections as to each exhibit relied upon. I find that each of these documents is either self-authenticating as a certified copy of a public record under Fed.R.Evid. 902(4) or an official publication under Fed.R.Evid. 902(5) or is properly authenticated as a public record from the public office where items of this nature are kept under Fed.R.Evid. 901(b)(7) by the declarations submitted in support thereof. As to defendants' hearsay objections, most of the exhibits considered by the court on this motion were utilized as evidence of the information considered by various public agencies and not to show the truth of the matter asserted in the documents as required by Fed.R.Evid. 801(c). To the extent that any exhibits were considered for the truth of the matter asserted, I find that they are either party admissions which do not constitute hearsay under Fed.R.Evid. 801(d) or are business or public records under Fed.R.Evid. 803(6) and 803(8) and therefore constitute exceptions to the hearsay rule.

chased the Circulating Bed Combustor, submitted an application for a research, development, and demonstration permit to the Environmental Protection Agency ("EPA") pursuant to the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, *et seq.* Through this application, Ogden sought permission from the EPA to conduct hazardous waste incineration testing in an effort to demonstrate the capabilities of this technology for potential commercial-scale use in the future. In April, 1986, the EPA issued a technical review of the Circulating Bed Combustor's performance based on two previous test burns which were conducted in May, 1984 and May, 1985. The EPA also undertook a risk assessment of the project and reviewed two other risk assessments done by the San Diego Air Pollution Control District and by Radian Corporation, concluding that "both the cancer and noncancer risks from emissions from the Ogden incinerator are acceptable in terms of EPA policy." (Plaintiff's Exhibit A at 534).

In July, 1986, the EPA sent a copy of a preliminary draft research, development and demonstration permit, which imposed a number of safety requirements, to the California Department of Health Services for its review. In August, the EPA issued a public notice of the draft permit and a Fact Sheet explaining the project. The public comment period ran from August 7, 1986 through October 6, 1986 and the EPA also conducted a public hearing in San Diego on September 8, 1986. On October 9, 1986, Ogden was notified that the Circulating Bed Combustor technology had been accepted into the EPA's Superfund Innova-

tive Technology Evaluation demonstration program[2] pursuant to 42 U.S.C. § 9660(b). In January, 1987, the EPA issued a Responsiveness Summary which responded to comments received on the draft permit. On February 20, 1987, the EPA issued a final research, development and demonstration permit for the Ogden project which incorporated additional restrictions based on concerns raised during the public comment period. The agency also issued another Fact Sheet on the project which concluded that the permit "ensures that human health and the environment are adequately protected." On July 29, 1987, the EPA Administrator denied petitions for review of the agency decision granting the permit.

Ogden also applied for a research, development and demonstration permit from the California Department of Health Services in July, 1985 and reapplied again in August, 1986. Pursuant to the California Environmental Quality Act, Cal.Pub.Res.Code § 21000 *et seq.*, the Department of Health Services, acting as the lead agency, undertook an initial study of the Ogden project. The City apparently agreed that the Department of Health Services should act as the "lead agency" in reviewing the project under the California Environmental Quality Act, with the City acting as a "responsible agency" as that term is defined by the statute.[3] On March 26, 1987, the Department of Health Services held an interagency meeting on the project, which was attended by the City Manager as well as representatives from the City Planning Department, the San Diego County Department of Health Services, the City Fire De-

---

**2.** While the research, development and demonstration permit program is provided for under the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, *et seq.*, the Superfund Innovative Technology Evaluation or SITE demonstration program is provided for under another federal statute, the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601, *et seq.* The distinction between the two statutes and the two relevant programs is more thoroughly discussed at §§ II(B)–(C) of this decision, *infra.* The important point here is that the Ogden Circulating Bed Combustor project has been sanctioned by the EPA under both programs.

**3.** Under the statute, a "lead agency" is defined as "the public agency which has the principal responsibility for carrying out or approving a project which may have a significant effect upon the environment." Cal.Pub.Res.Code § 21067. A "responsible agency," on the other hand, is defined as "a public agency, other than the lead agency, which has responsibility for carrying out or approving a project." *Id.* § 21069. The significance of this distinction is discussed at § III of this decision, *infra.*

partment, the San Diego Air Pollution Control District, and the Regional Water Quality Control Board. On May 19, 1987, the Department of Health Services completed its Initial Study which reviewed the test burn results and the three existing risk assessments, as well as the Department's own risk assessment, concluding that "the proposed facility will not have a deleterious effect on the environment." (Plaintiff's Exhibit C at 3087).

On May 22, 1987, the Department of Health Services, acting as the lead agency, issued a proposed Negative Declaration for the Ogden project, which under the California Environmental Quality Act means that the agency has found that the proposed project does not have a significant effect on the environment and an environmental impact report is not required. Cal.Pub. Res.Code § 21080(c).[4] On the same day, the Department of Health Services also issued a draft research, development and demonstration permit for the project which, like the EPA permit, contained numerous restrictions designed to ensure protection of human health and the environment. The public comment period on the draft permit extended through July 16, 1987 and the Department held a public hearing on the project on June 26, 1987 at the University Towne Centre. On September 24, 1987, the Department of Health Services issued a Response to Comments on the draft permit and the proposed Negative Declaration and at the same time issued the requested research, development and demonstration permit. In addition to the many protective requirements, the permit explicitly states that the operation of the incinerator is for research and data collection only and that before each test series, Ogden must submit the San Diego Air Pollution Control District's risk assessment to the Department of Health Services and obtain written approval from the Department to conduct the test. On September 24, the Department of Health Services also issued a final Nega-

tive Declaration under the California Environmental Quality Act, meaning that no environmental impact report had to be prepared. Pursuant to Cal.Pub.Res.Code §§ 21108 and 21152, on September 25, 1987, the Department of Health Services filed a notice with the State Office of Planning and Research stating that the research, development and demonstration permit had been approved and that no environmental impact report was required.

In addition, the San Diego Air Pollution Control District has established a risk assessment model to evaluate the health impacts of various hazardous wastes which Ogden might propose to burn. In January, 1987, the Air Pollution Control District issued a permit to operate the Circulating Bed Combustor to burn coal and carbon refractory materials. This permit was revised and reissued in January, 1988 and formally establishes the procedure by which the Air Pollution Control District will analyze the proposed materials to be burned in each of Ogden's test burns. Test burns of material other than coal or carbon refractory material will be approved by the Air Pollution Control District only if its analysis indicates no adverse air quality impacts. On June 30, 1987, the San Diego County Department of Health Services issued a HAZMAT permit to Ogden to establish and operate a hazardous materials establishment pursuant to San Diego County Code of Regulatory County Ordinances § 68.905. Finally, on September 3, 1987, the City Fire Department issued a CEDMAT permit to Ogden for hazardous materials storage at the facility pursuant to San Diego Uniform Fire Code § 80.102–103.

While Ogden sought and obtained these permits from various agencies, the City was kept abreast of permitting developments and eventually chose to interject itself into the decision-making process. On August 20, 1986, the City Council's Public Services & Safety Committee recommended that the City Council adopt a resolution

---

**4.** A "negative declaration," as defined by the Act, is essentially "a written statement briefly describing the reasons that a proposed project will not have a significant effect on the environment and does not require the preparation of an envi-

ronmental impact report." Cal.Pub.Res.Code § 21064. It is issued as an alternative to an environmental impact report after the lead agency's assessment of the project. *Id.* § 21080. *See also,* discussion at § III, *infra.*

directing the City Manager to develop a permitting process for hazardous waste treatment facilities. On October 13, 1986, after the EPA's public hearing on the proposed Circulating Bed Combustor project, the City Council adopted a resolution directing the City Manager, the City Attorney and the Planning Department to report on methods for developing a permitting and environmental review process for projects related to the development or implementation of toxic waste management technologies. The Planning Department subsequently recommended an emergency ordinance requiring a conditional use permit for hazardous waste facilities that have requested a research, development and demonstration permit, thereby allowing the City Council to make the final decision on such projects. At an October 28, 1986 hearing, the City Council expressly recognized that Ogden was the only applicant for a research, development and demonstration permit in San Diego and adopted Interim Ordinance No. 0–16743, which gave the City Council authority to require a conditional use permit for any facility, activity or use of property in the scientific research zone "which is required by federal law to obtain a research, development and demonstration permit for Hazardous Waste Treatment from the EPA or any other agency of the United States Government pursuant to the Federal Resources Conservation and Recovery Act." (Plaintiff's Exhibit G at 218).

Despite letters to the City Council from Ogden and the San Diego Air Pollution Control District explaining the detailed federal and state assessment of the proposed facility that had already been done, the Council tentatively adopted Ordinance No. 0–16931 ("Permanent Conditional Use Permit Ordinance") on August 11, 1987, which essentially mimicked the language of the Interim Conditional Use Permit Ordinance. The Permanent Conditional Use Permit Ordinance was formally adopted on September 8, 1987. At the August 11, 1987 hearing, a Planning Department representative stated that a conditional use permit application by Ogden could be processed by that Department within 60 days. The City

Council then issued a directive to proceed on this timetable in order to allow the Council time to rule on the application before the December 7, 1987 expiration of its term.

On August 25, 1987, Ogden representatives attended a meeting at the Planning Department and in accordance with the deadline set by the Planning Department staff, submitted its application for a conditional use permit, with all requested supporting material, on August 31, 1987. Nevertheless, on September 28, 1987, the Planning Department requested that additional material be submitted, which Ogden submitted on September 29, 1987. Plaintiff states that on October 14, Patrick Lowe of the Planning Department advised Ogden that the Department had not yet looked at this additional material. In response to this statement, Ogden filed a petition for a Preemptory Writ of Mandate with the Superior Court on November 5, 1987. The petition sought to compel the City to process Ogden's application in accordance with the City's own timetable. On November 18, 1987, the court issued the writ, directing the Planning Department to take all necessary steps "to accommodate and further the hearing of Ogden's application for a conditional use permit before the Planning Commission on November 19, 1987 and before the City Council on or before December 1, 1987, the last scheduled meeting date of the current City Council." (Plaintiff's Exhibit H at 428). At the November 19, 1987 hearing before the Planning Commission, the Commission requested that the City Council return the permit to the Commission for greater consideration. At the December 1, 1987 hearing, the City Council continued the matter for one week. However, the Council did allow EPA representatives to testify in support of the project. At the December 8, 1987 hearing, the Ogden application was taken up by the new City Council, which heard testimony that the EPA, the California Department of Health Services and the San Diego Air Pollution Control District had already issued permits and that the City was required to abide by the Negative Dec-

laration issued by the Department of Health Services, finding that no environmental impact report was required. Department of Health Services representatives testified about the extensive screening of the project done by the Department and about the Department's commitment to developing alternatives to land disposal. The Planning Department staff testified that it had not been given sufficient time to review the proposed research, development and demonstration project. After extensive discussion about the lack of a thorough evaluation by the City of the proposed project, the Council voted to deny Ogden's application for a conditional use permit under the new ordinance. The final Resolution on the Ogden project waived the one-year requirement to reapply for a conditional use permit, but specifically required that any such reapplication must include an environmental impact report.

On February 17, 1988, Ogden filed the complaint in this case against the City, the City Council and individual City Council members who voted in favor of denying the permit. The complaint alleges 13 claims for relief, including federal preemption under the supremacy clause, violation of the Resource Conservation and Recovery Act, state preemption, violation of the requirement that local regulations be rationally related to the regional general welfare, violation of the California Environmental Quality Act, violation of the commerce clause, violation of the equal protection clause, discriminatory zoning, violation of the takings clause of the federal and state constitutions, and violation of the due process clause, as well as claims for declaratory and injunctive relief and for damages in an amount to be ascertained at a later time. Ogden now moves for summary judgment on its first, second, third, fourth, fifth, sixth, seventh, eighth, eleventh, and twelfth causes of action, thereby excluding only the two takings claims and the claim for injunctive relief. Defendants respond first that there are material facts in dispute and second that if the court finds no disputed facts, summary judgment in favor of defendants is appropriate.

## DISCUSSION

### I. *Legal Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that the court shall render a summary judgment if the papers submitted "show [1] that there is no genuine issue as to any material fact and [2] that the moving party is entitled to a judgment as a matter of law." The moving party has the initial burden of demonstrating that summary judgment is proper. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *International Union of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir.1985). This burden may be discharged by pointing out to the district court that there is an absence of evidence to support an element of the nonmoving party's case. *Celotex v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmoving party to demonstrate the existence of specific facts showing that there is a genuine issue for trial. *Celotex*, 106 S.Ct. at 2553. In considering a motion for summary judgment, the court must believe the evidence of the nonmovant and must draw all justifiable inferences in his or her favor. *Adickes*, 398 U.S. at 158–159, 90 S.Ct. at 1609; *Lew v. Kona Hospital*, 754 F.2d 1420, 1423 (9th Cir.1985); *Bricklayers*, 752 F.2d at 1404. However, in determining whether the nonmovant has met his or her burden, the court must consider the evidentiary burden imposed upon the nonmovant by the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

Summary judgment is not proper if the parties dispute the inferences that should be drawn from uncontested facts. *Bricklayers*, 752 F.2d at 1405. Additionally, summary judgment rarely is appropriate when a party's intent or motive is at issue. *Atkins v. Union Pacific Railroad*, 685 F.2d 1146, 1149 (9th Cir.1982). Summary judgment is particularly inappropriate when credibility is in issue. *Securities and Exchange Com'n v. Koracorp Industries*, 575 F.2d 692, 699 (9th Cir.), *cert.*

*denied,* 439 U.S. 953, 99 S.Ct. 348, 58 L.Ed. 2d 343 (1978).

## II. *Federal Preemption*

Plaintiff's primary argument is that the City's application of its Conditional Use Permit Ordinance to the Ogden project is preempted by federal law. Specifically, plaintiff argues that the City's actions defeat the congressional intent underlying the research, development and demonstration permit program and the Superfund Innovative Technology Evaluation program to encourage the development of innovative, safer alternatives to land disposal of hazardous wastes. In addition, plaintiff contends that the City's actions directly conflict with these federal laws by "second-guessing" the EPA's environmental assessment of the Ogden project.

### A. The Preemption Doctrine

The supremacy clause of the United States Constitution, art. VI, cl. 2, preempts state or local laws that interfere with or are contrary to federal law. *Hillsborough Co. v. Automated Medical Labs, Inc.,* 471 U.S. 707, 712, 105 S.Ct. 2371, 2375, 85 L.Ed. 2d 714 (1985). There are essentially three ways in which a federal law may preempt a state law: (1) the federal law may contain an explicit preemption provision (express preemption); (2) the federal legislation may be sufficiently comprehensive to create the inference that Congress intended to occupy an entire field of regulation (implied preemption); and (3) although the federal law does not entirely displace state law, the particular state regulation actually conflicts with the federal law. *See Mich. Canners and Freezers v. Agr. Marketing and Bargaining Board,* 467 U.S. 461, 469, 104 S.Ct. 2518, 2523, 81 L.Ed.2d 399 (1984). The third type of preemption, involving a conflict between state and federal law, may arise when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). Plaintiff argues that it is this third type of preemption that precludes the City's application of the conditional use permit ordinance to the Ogden project.

### B. The Research, Development and Demonstration Permit Program

In support of its preemption argument, plaintiff cites extensively to the language and legislative history of the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, *et seq.,* and in particular, to the 1984 amendment to § 6925(g) providing for research, development and demonstration permits. The Act was originally passed in 1976 to promote the protection of health and the environment and to conserve resources by, among other things, "regulating the treatment, storage, transportation, and disposal of hazardous wastes which have adverse effects on health and the environment." 42 U.S.C. § 6902(4). In recognition of the worsening national problem in disposing of wastes, especially hazardous wastes, the Resource Conservation and Recovery Act was amended in 1980 and again in 1984. As evidenced by these changes, the Act has focused increasingly on the problem of hazardous waste and most recently, on the need to develop environmentally sound alternatives to land disposal. For instance, as part of the 1984 Amendments, the statute states:

> The Congress hereby declares it to be the national policy of the United States that wherever feasible, the generation of hazardous waste is to be reduced or eliminated as expeditiously as possible. Waste that is nevertheless generated should be treated, stored, or disposed of so as to minimize the present and future threat to human health and the environment.

42 U.S.C. § 6902(b). In furthering this policy, the amended Act sets forth a number of objectives, including among others:

1) prohibiting future open dumping on the land, 42 U.S.C. § 6902(a)(3);

2) minimizing the generation of hazardous waste and land disposal of hazardous waste by encouraging process substitution, materials recovery, properly conducted recycling and reuse, and treatment, *id.* § 6902(a)(6);

3) promoting the demonstration, construction, and application of management, recovery and conservation systems which preserve and enhance environmental quality, *id.* § 6902(a)(10).

As the Conference Report on the 1984 legislation explained:

> [T]he Conferees intend that through the vigorous implementation of the objectives of this Act, land disposal will be eliminated for many wastes and minimized for all others, and that advanced treatment, recycling, incineration and other hazardous waste control technologies should replace land disposal.

H.R.Conf.Rep. No. 98–1133, 98th Cong., 2d Sess. at 80–81, *reprinted in* 1984 U.S.Code Cong. and Ad.News at 5651.

As part of this effort, Congress added the research, development and demonstration permit provision which states in part:

> The Administrator may issue a research, development, and demonstration permit for any hazardous waste treatment facility which proposes to utilize an innovative and experimental hazardous waste treatment technology or process for which permit standards for such experimental activity have not been promulgated under this subchapter. Any such permit shall include such terms and conditions as will assure protection of human health and the environment.

42 U.S.C. § 6925(g)(1). This section also discusses the various criteria for issuing and terminating these research, development and demonstration permits and states that for the purpose of expediting review and issuance of these permits, the Administrator may waive the Agency's more general permit requirements, with some exceptions. *Id.* § 6925(g)(2). In floor debate on this amendment, a number of congressmen noted that the provision was designed to provide expedited permitting for the limited purpose of demonstrating innovative alternatives to land disposal, while still maintaining adequate environmental safeguards. *See* 129 Cong.Rec. at H8158–H8159.

### C. The Superfund Innovative Technology Evaluation Program

Plaintiff points out that the Ogden project has also been accepted into the Superfund Innovative Technology Evaluation program. The Superfund Innovative Technology Evaluation program is administered by the EPA as part of the Comprehensive Environmental Response, Compensation, and Liability Act (or "Superfund"), 42 U.S.C. § 9601, *et seq.*, another federal statute which was originally passed in 1980 to facilitate the clean-up of existing hazardous waste sites. The Superfund Act was amended in 1986 to include national cleanup standards for such sites. 42 U.S.C. § 9621. The amended Act now requires the President to assess permanent solutions and alternative treatment technologies for such sites that will result in a permanent and significant decrease in the toxicity, mobility, or volume of the hazardous substances and to utilize such alternatives to the maximum extent practicable in selecting a remedial action. *Id.* § 9621(b)(1). In furthering these objectives, Congress added the Alternative or Innovative Treatment Technology Research and Demonstration Program (implemented by the EPA as the Superfund Innovative Technology Evaluation or SITE program) under 42 U.S.C. § 9660(b), which directs the EPA to "carry out a program of research, evaluation, testing, development and demonstration of alternative or innovative treatment technologies which may be utilized ... to achieve more permanent protection of human health and welfare and the environment." Like the research, development and demonstration permit process under the Resource Conservation and Recovery Act, this provision provides for relatively quick project selection once an application has been completed. *Id.* § 9660(b)(5)(D). The House Report on the legislation expressly recognized that the purpose of this section is to build upon the existing encouragement already provided in the Resource Conservation and Recovery Act for the development of innovative technologies that can be used to provide permanent solutions to the problems faced at Superfund cleanup sites. H.R.Rep. No. 99–

253, 99th Cong., 2d Sess. at 37–38, *reprinted in* 1986 U.S.Code Cong. & Ad.News at 2835, 3160–61.

Thus, it is evident that one of the congressional objectives embodied in both the Resource Conservation and Recovery Act and Superfund, especially in the most recent amendments to both statutes, is to provide encouragement to the development of safe alternatives to land disposal of hazardous waste, including incineration technology, through, among other things, expedited permitting and federal recognition of private demonstration projects.

### D. The "Savings" Clause

As plaintiff readily admits, it is equally clear that Congress neither expressly preempted nor impliedly occupied the entire field of hazardous waste regulation. In fact, one of the express objectives of the Resource Conservation and Recovery Act is the establishment of a viable federal-state partnership to carry out the purposes of the Act. 42 U.S.C. § 6902(a)(7). The statute specifically provides that a state may obtain authorization to carry out a hazardous waste regulatory program "in lieu of" the federal program, provided that the state program is equivalent to and not inconsistent with the federal one. 42 U.S.C. § 6926(b). While such delegation of federal regulatory responsibility runs only to the states, and not to local government entities, the Act also expressly provides that:

> Nothing in this chapter shall be construed to prohibit any State or political subdivision thereof from imposing any requirements, including those for site selection, which are more stringent than those imposed by such regulations.

42 U.S.C. § 6929. It is this "savings" clause that forms the primary basis for defendants' argument that the City's Conditional Use Permit Ordinance is not preempted by federal law.

As defendants argue, the "savings" clause distinguishes this case from other preemption cases cited by the parties. For example, three of the leading preemption cases extensively discussed by plaintiff, *Capital Cities Cable v. Crisp*, 467 U.S.

691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984), *Fidelity Federal Savings and Loan Ass'n v. De La Cuesta*, 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982), and *Jones v. Rath Packing Co.*, 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977), do not contain a discussion of any similar savings clause. A fourth case, *International Paper Co. v. Ouellette*, 479 U.S. 481, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987), upon which plaintiff also heavily relies, does involve a discussion of two "savings" clauses in the Clean Water Act which reserve residual regulatory authority to the states. That case, while at times instructive, is factually distinguishable. In *Ouellette*, the Court found that the Act preempted common law suits in one state (the affected state) against a polluter in another state (the source state) because such suits would disrupt the regulatory scheme envisioned in the Act whereby both the federal government and the source state had regulatory responsibility over pollution sources within the state. Thus, the Act did not bar nuisance suits in the source state; it only preempted suits in other affected states because this could potentially bring a number of additional states into the regulatory scheme, a result clearly not intended by Congress. In the instant case, such complex interstate problems are not present and Congress, by way of the "savings" clause, clearly did envision the extra layer of regulatory requirements that might be imposed by local governments. *See e.g., Borough of Glassboro v. Gloucester County Bd.*, 100 N.J. 134, 495 A.2d 49 (1985).

### E. The Conditional Use Permit Ordinance and Its Application

Defendants argue that the City's requirement that Ogden obtain a conditional use permit under the new ordinance is essentially a "more stringent requirement" which is expressly authorized by the "savings" clause. As defendants point out, the situation here is in some respects similar to that in *Pacific Gas & Electric v. Energy Resources Commission*, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983), where the Court ultimately found that the state's moratorium on nuclear power plants was

not preempted by the Atomic Energy Act and the regulatory authority it confers upon the Nuclear Regulatory Commission. The *Pacific Gas & Electric* Court was faced with two "savings" provisions, one of which provided that nothing in the Act should be construed to affect state or local authority over the generation, sale or transmission of electrical power from a nuclear plant, and the other of which more generally provided that the Act should not be construed to affect the regulatory activity of state or local authorities "for purposes other than protection against radiation hazards." *Id.* at 461 U.S. at 199, 103 S.Ct. at 1720. The Court found that Congress' objective in passing the Act was to regulate the radiological safety aspects involved in the construction of nuclear plants but that Congress also intended that states would retain their traditional responsibility in the field of regulating electrical utilities for determining questions of need, reliability, cost, and other related state concerns. *Id.* 461 U.S. at 205, 103 S.Ct. at 1723. The court specifically noted that "these economic aspects of electrical generation have been regulated for many years and in great detail by the States." *Id.* Because the Court found that California's actions in that case were designed to address economic rather than safety concerns, even a complete moratorium on the construction of nuclear plants was not preempted by Congress' undisputed intent to simultaneously encourage the development of nuclear power and regulate its safety.

■ Similarly, in the hazardous waste field, the statutes in question, as well as their legislative history, evidence Congress' intent to provide a clear federal presence in the research and development area while also allowing state and local governments to retain their traditional regulatory authority over hazardous waste facilities to some degree. In issuing a research, development and demonstration permit, the EPA must include "such terms and conditions as will assure protection of human health and the environment." 42 U.S.C. § 6925(g). Thus, Congress did not leave the EPA free to use local populations as "white rats," as councilwoman Wolfsheimer suggested during the City Council hearings. (Plaintiff's Exhibit H at 947). Rather, with this requirement, Congress attempted to balance the need for expedited development and demonstration of innovative alternative technologies with the need to ensure the continued health and safety of the community. However, by inclusion of the "savings" clause, Congress also left room for local governments to become involved in the regulation of hazardous waste facilities, presumably including this type of research and development facilities.[5] It is particularly noteworthy that the Resource Conservation and Recovery Act's "savings" clause explicitly includes a reference to requirements regarding site selection, thereby implicating the traditional land use authority of local governments. In light of this explicit language, this court finds that the requirement of a conditional use permit, which is one of the traditional tools in a local government's arsenal of land use regulation, is not *per se* preempted. *See California Coastal Comm. v. Granite Rock Co.*, 480 U.S. 572, ——, 107 S.Ct. 1419, 1429, 94 L.Ed.2d 577 (1987).

However, this finding does not end the inquiry. Unlike the instant action, *Pacific Gas & Electric* involved two very discrete spheres of regulatory activity: radiological safety by the federal government and economic viability by the state government.

---

5. The "savings" clause was added to the Statute in 1980, Pub.L. No. 96–482, 94 Stat. 2342, while the research, development and demonstration permit provision was not adopted until the 1984 amendments, Pub.L. No. 98–616, 98 Stat. 3221. However, the "savings" clause is explicitly applicable to the entire chapter, which now includes the research, development and demonstration permit provision. Thus, this court presumes that Congress intended the two provisions to exist side-by-side in a single statutory scheme and analyzes the federal preemption issue in accordance with this assumption. To the extent that state or local governments might exercise their rights under the older "savings" clause to significantly undercut federal objectives embodied in the more recently adopted research, development and demonstration permit program, it is for Congress to rethink the existing division of regulatory authority. *Pacific Gas & Electric, supra,* 461 U.S. at 223, 103 S.Ct. at 1732.

Here, as defendants themselves point out, traditional land use and zoning decisions at the local level are necessarily intertwined with concerns about human health and the environment, over which the EPA has also been given regulatory authority in this instance. As the court in *Granite Rock, supra,* observed, "the line between environmental regulation and land use planning will not always be bright." 107 S.Ct. at 1428. Nevertheless, this court is forced to examine that line in determining whether Congress has created an exclusive sphere of regulatory authority upon which local governments may not tread and if so, whether that sphere is broad enough to preempt the City's actions in this case.

■ Despite congressional inclusion of the seemingly broad language of the "savings" clause in the Resource Conservation and Recovery Act, it is also clear from the Act and its legislative history that a local government's residual authority to regulate hazardous waste facilities is not unlimited. For instance, a local regulation that prohibited any research, development and demonstration permitted facilities would clearly stand as an obstacle to the implementation of congressional objectives and would therefore be invalid under the third type of federal preemption articulated by the Court in *Hines, supra;* the express language of the "savings" clause only provides for more stringent requirements than those imposed by the federal government, not outright bans on such activity. As the court in *Ensco, Inc. v. Dumas,* 807 F.2d 743 (8th Cir.1986), noted in striking down a local ordinance prohibiting certain hazardous wastes within the county boundaries:

> Section 6929 acknowledges only the authority of state and local governmental entities to make good-faith adaptations of federal policy to local conditions.... A county cannot, by attaching the label "more stringent requirements" or "site selection" to an ordinance that in language and history defies such description, arrogate to itself the power to enact a measure that as a practical matter cannot function other than to subvert federal policies concerning the safe handling of hazardous waste.

807 F.2d at 745. As another insightfully stated in finding preemption under another federal statute regulating hazardous materials, "[i]f every locality were able to dodge responsibility for and participation in this program through artfully designed ordinances, the national goal for safe, environmentally sound toxic waste disposal would surely be frustrated." *Rollins Environmental v. Parish of St. James,* 775 F.2d 627, 637 (5th Cir.1985).

The issue becomes significantly more complex where, as here, the local ordinance purportedly seeks only to impose the additional requirement of a conditional use permit (and presumably any accompanying restrictions), but in fact has the actual effect of prohibiting the project because the permit is denied. On the one hand, as defendants suggest, to construe every permit denial as creating a *de facto* conflict with congressional objectives would substantially eviscerate the role of local governments in choosing one site over another, a role presumably envisioned in the "savings" clause. On the other hand, allowing a locality to completely evade judicial review simply by requiring a conditional use permit, which is then granted or denied at the discretion of local decision-makers, creates the potential for the type of "sham" and "subterfuge" found by the court in *Rollins. Id.* Such a discretionary review process might be used to do indirectly what the *Ensco* court found the City cannot do directly. This possibility is especially troubling under the facts of this case because the Conditional Use Permit Ordinance provides no standards to govern the issuance of a permit and the City Council has adopted no specific requirements for such facilities. In response to these factual circumstances, the parties have resorted to a debate about the Council's motives in denying the permit. Rather than engage in the "unsatisfactory venture" of attempting to ascertain the underlying motives of individual councilmembers in passing the Conditional Use Permit Ordinance and ultimately denying the permit, *Pacific Gas & Electric, supra,* 461 U.S. at 216, 103 S.Ct. at 1728, this court focuses on the articulated

basis for the City's actions, as evidenced by the record before it, in determining whether the Council's conduct impermissibly conflicts with, or erects obstacles which frustrate, congressional intent.

Relying on the record, plaintiff argues that the EPA has found the project to be safe, that the City denied the permit because it was not satisfied with the EPA's judgment on the safety issue, and that such "second-guessing" of the EPA's conclusions on the project's health and environmental impacts is preempted. In *First Iowa Hydro–Electric Co-op. v. Federal Power Comm.*, 328 U.S. 152, 66 S.Ct. 906, 90 L.Ed. 1143 (1946), the Court held that despite the dual federal-state regulatory scheme that existed under the Federal Power Act, the state's attempt to subject a project to the very same requirements that Congress placed in the discretion of the federal agency was preempted because it would subject the federal agency's judgment in this sphere to the veto power of the state. Whether or not this same analysis should apply to a different statutory scheme under the Resource Conservation and Recovery Act and Superfund is at least open to question; however, the court need not reach this issue because the City has not imposed *any* specific requirements whatsoever upon the Circulating Bed Combustor project, except the minimally permissible requirement for a conditional use permit. Rather, the record reflects that the City based its denial on much more vague and unspecified reasons.

More specifically, Resolution No. R–269971, adopted on December 8, 1987, in which the City denied Ogden's permit application, finds that Ogden's application for a permit was denied because the project had not had the benefit of a thorough evaluation to determine whether it would "adversely affect the neighborhood, the General Plan or the Community Plan" or whether it would be "detrimental to the health, safety or general welfare of persons residing or working in the area." (Plaintiff's Exhibit G at 1001). The Resolution further states that due to this lack of evaluation, the Council cannot determine whether the proposed use will comply with all relevant municipal regulations. While waiving the one-year requirement for reapplication, the Resolution expressly requires Ogden to include an environmental impact report with any future application.

Under California law, such findings of fact by a local body regarding a decision on a variance must be supported by substantial evidence in the record. *Topanga Ass'n for a Scenic Community v. County of Los Angeles*, 11 Cal.3d 506, 514, 113 Cal.Rptr. 836, 840–841, 522 P.2d 12, 16 (1974). This same requirement has been extended to the "quasi-judicial, administrative" decision on a conditional use permit. *Jacobson v. County of Los Angeles*, 69 Cal.App.3d 374, 391, 137 Cal.Rptr. 909, 919 (1977). Accordingly, it is appropriate to examine the hearings before the City's Council to determine whether they support the formal findings in the City's Resolution denying the permit.

The court has carefully examined the record of the City Council hearings on this matter and finds that councilmembers as well as witnesses opposing the project spoke almost exclusively in terms of health and safety concerns and focused repeatedly on the lack of an environmental impact report on the project. (*See, e.g.*, Plaintiff's Exhibit H at 976–80, 886–89, 920, 924–37, 945–48, 979–87). The Interim Conditional Use Permit Ordinance was also couched in terms of the risk to human health and the environment and, as already noted, the final Resolution raised the question of potential adverse impacts on human health and safety, as well as the need for an environmental impact report. In their opposition papers, defendants themselves argue that the data and testimony as to the safety of the project was conflicting, suggesting again that health, safety and the environmental impacts of the project were of prime concern to councilmembers in denying the permit. Yet the record reveals that councilmembers did not articulate any specific health, safety or environmental concerns, choosing instead to focus on the more general finding that the EPA's conclusions were not necessarily adequate to meet local standards. (*See, e.g.*, Plaintiff's Exhibit H at 969).

There is no dispute that, as required by 42 U.S.C. § 6925(g), the EPA incorporated a number of protective requirements into Ogden's research, development and demonstration permit (Plaintiff's Exhibit A at 1080) and ultimately concluded that compliance with these terms and conditions would ensure adequate protection of human health and the environment. (Plaintiff's Exhibit A at 1103, 1104; Affidavit of John Skinner). In addition, this project had the scrutiny and input of California's Department of Health Services, with the state agency issuing a separate permit containing an extensive list of restrictive requirements (Plaintiff's Exhibit C at 3970) and reaching the same conclusions about the environmental impacts of the project. (Plaintiff's Exhibit C at 3045; Declaration of Alex Cunningham).[6] Thus, the EPA has fulfilled its congressional mandate to balance the competing concerns of expedited project review and environmental safety in issuing a research, development and demonstration permit, finding that the Circulating Bed Combustor project furthers the federal objective of encouraging innovative technologies in an environmentally sound manner. (Affidavit of John Skinner).

Without deciding to what extent the City might impose additional environmental restrictions on the facility in exercising its traditional land use authority, I find that denial of the permit based on generalized environmental or health and safety concerns, where the EPA has already found the health, safety, and environmental risks to be acceptable, is impermissible under the doctrine of federal preemption. Allowing local governments to impose a permit re-

quirement and then to deny the permit on unspecified environmental grounds, without articulating specific health or safety concerns or setting forth particular environmental requirements which the facility must meet, surely frustrates congressional intent behind the whole research, development, and demonstration program. By summarily denying the permit without providing any guidance as to how Ogden might address the City's health, safety, and environmental concerns, the City has indefinitely delayed the start-up of the project. Its actions stand as an obstacle to the accomplishment of the clear congressional objective of providing an accelerated review for such demonstration projects and are therefore preempted. *See Hines, supra,* 312 U.S. at 67, 61 S.Ct. at 404.

The court finds from the history of this project, only part of which is summarized at the beginning of this decision, that the City had ample time to pass local requirements for a hazardous waste regulatory program pursuant to the "savings" clause, 42 U.S.C. § 6929. Indeed, since 1985, both the EPA and the Department of Health Services have been solicitous of the City concerns and have kept the City notified and involved in the processing of the permits. Nonetheless, by the time Ogden's application came before the City Council on December 8, 1987, the City had not adopted any specific requirements, denying the application based on general environmental, health, and safety grounds. It is this action which the court finds violates the principle of federal preemption.

The record reveals that the City Council was also concerned about the lack of an

---

**6.** The question of whether the state agency can *require* a permit without also implicating the doctrine of federal preemption, though somewhat troubling, was not raised in this case. Under the Resource Conservation and Recovery Act, the state's potential regulatory role in the hazardous waste field is considerably broader than that of local entities. In particular, as already discussed, the state may obtain authorization to carry out a comprehensive hazardous waste regulatory program "in lieu of" the federal program. 42 U.S.C. § 6926(b). However, whether this delegation of responsibility also extends to the research, development and demonstration program under 42 U.S.C. § 6925(g)

was not addressed by the parties. Moreover, there is no evidence before the court on the degree of regulatory responsibility that had actually been delegated to the Department of Health Services by the EPA during the period the Ogden project was being reviewed by the state agency. Nevertheless, Ogden voluntarily sought the state's approval of its project and is apparently willing to comply with the requirements imposed in the research, development and demonstration permit issued by the Department of Health Services. Because neither side has questioned the propriety of the state's role in this case, the court does not reach the issue.

environmental impact report on the project. (*See, e.g.,* Plaintiff's Exhibit H at 946, 969–70, 985–87). To the extent that this concern is merely an alternative way in which the City chose to express its unspecified health and safety concerns, the above analysis is equally applicable. To the extent that the City was attempting to require the production of an environmental impact report in compliance with the California Environmental Quality Act, the City cannot properly require such compliance or base its permit denial on this requirement. As discussed more thoroughly below, *infra* § III, the California Department of Health Services, as the lead agency on the Ogden project, determined that an environmental impact report was not required and the City has not shown that it has met any of the conditions necessary to challenge this determination.

Defendants argue, nevertheless, that although safety and environmental concerns animated the City's discussion of the project, the permit was denied "based upon a lack of information upon which to base the zoning or land use decision of whether the proposed location was reasonable." (Defendants' Opposition at 13). They conclude, therefore, that the City's concerns did not duplicate those already addressed by the EPA and the Department of Health Services, but rather, focused on legitimate local land use issues. In support of this position, defendants cite to a handful of statements by councilmembers and the Planning Department. As with the similar statements about safety issues, these few references in the record to more general land use concerns do not identify any specific examples or articulate any unfulfilled requirements relating to land use issues. For example, Councilwoman Wolfsheimer's comments as to the City's findings for denying the permit are merely conclusory statements which were later incorporated into the final Resolution; they do not identify any particular impacts on the neighborhood or the General Plan. (Plaintiff's Exhibit H at 945–946). Defendants' citations to Councilwoman McColl's statement that "local concerns have to be addressed" is similarly uninformative. (Plaintiff's Exhibit H at 969).

Other cited statements by Councilman Henderson, Councilman Pratt and Mayor O'Connor all refer to the lack of time and information to adequately review the project and the need for Ogden to work with the community. (*See* Plaintiff's Exhibit H at 975–976, 981 and 989–90). However, there is nothing in the record to suggest that there was specific material or information that the City lacked. In fact, according to the undisputed statements of plaintiff, Ogden initially met the August 31 deadline set by the Planning Department and when the Department requested additional information in September, Ogden supplied this information the next day. It appears from the record that Ogden promptly provided all materials requested by defendants.

The only specific substantive areas of concern found in the record are those identified in the Planning Department's November 24, 1987 Report to the City Council and referred to by a Planning Department representative at the December 8, 1987 Council hearing. (Plaintiff's Exhibit H at 581–582, 977). Both the Report and the testimony before the Council recommended that the matter be referred back to the Planning Commission in order to allow the Planning Department time to further evaluate these specific questions. However, the City chose to deny the permit outright, rejecting an alternative motion to refer the application back to the Planning Department for further review. (Plaintiff's Exhibit H at 973, 976). The court need not reach the issue of whether the City can legitimately examine or regulate the areas identified in the Planning Department's Report without treading on federally preempted ground because it finds that denial of the permit for lack of adequate review by the City was improper.

As previously noted, at the Council's August 11, 1987 hearing, a Planning Department representative stated that a conditional use permit application by Ogden could be processed by that Department within 60 days of submission and Ogden in fact sub-

mitted materials according to the Department's own timetables. By the City's own schedule, therefore, a review of the project should have been completed by the December 1, 1987 Council meeting and certainly by the December 8 hearing. Yet, Ogden was forced to seek a Preemptory Writ of Mandate from the California Superior Court when the Department failed to take timely action on the matter. Pursuant to Fed.R.Evid. 201, this court takes judicial notice of plaintiff's petition and the Superior Court's issuance of the writ. *See MGIC Indemnity Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir.1986). In ordering the Planning Commission and the City Council to take all necessary steps to accommodate and further the hearing of Ogden's application, the Superior Court presumably found that defendants had been allowed sufficient time under their own timetable to review the project.

Allowing the City to simply deny a conditional use permit application for lack of adequate information and study, when Ogden provided all requested material in a timely manner and the City selected its own timetable for processing the application, would frustrate Congress' mandate to provide for review and permitting of these projects in an expedited fashion. If the City legitimately lacks relevant information or adequate time to review the project, referring the matter back to the Planning Commission might be an appropriate course of action. But an outright denial for this same reason would place plaintiff back at square one and would create, at best, a lengthy delay, forcing Ogden to restart the entire conditional use permitting process from the beginning. I find that this course of conduct is preempted by federal law because it poses a significant obstacle to the fulfillment of a clear congressional objective. *See Hines, supra,* 312 U.S. at 67, 61 S.Ct. at 404.

In sum, the record reveals that defendants denied plaintiff's application for a conditional use permit based on grounds that are impermissible under the doctrine of federal preemption. Defendants have failed to point to any nonpreempted grounds for the denial and therefore have failed to meet their burden under *Celotex, supra.* Accordingly, plaintiff's motion for summary judgment on its first cause of action alleging federal preemption is granted.

### III. *Violation of the California Environmental Quality Act*

In light of this court's ruling on plaintiff's claim for declaratory relief, *see infra* § IV, it is necessary to address the additional question of whether the City may require an environmental impact report for Ogden's incineration project. In particular, plaintiff argues that the City's insistence upon the submission of an environmental impact report as a condition of approving Ogden's conditional use permit application is a clear violation of the California Environmental Quality Act.

Under the Act, the lead agency for a project, with input from other responsible agencies, has final authority for determining whether an environmental impact report is required for a particular project. A "lead agency" under the statute is "the public agency which has the principal responsibility for carrying out or approving a project." Cal.Pub.Res.Code § 21067. A "responsible agency" is any other public agency which also has responsibility for carrying out or approving a project. *Id.* § 21069. Only one agency can act as the lead agency for any particular project, Cal. Admin.Code tit. 14, § 15050, and the determination of whether the project may have a significant effect on the environment is to be made by this lead agency. Cal.Pub.Res. Code § 21165.

As part of the environmental review process, the lead agency must conduct an initial study of the potential significant impacts of the project on the environment, Cal.Admin.Code tit. 14, § 15063(a), and is required to consult with responsible agencies during preparation of the study. *Id.* § 15063(g). In making its final determination:

> The lead agency shall determine whether a project may have a significant effect on the environment based on substantial evi-

dence in the record. The existence of public controversy over the environmental effects of a project shall not require preparation of an environmental impact report if there is no substantial evidence before the agency that the project may have a significant effect on the environment. Cal.Pub.Res.Code § 21082.2. Finally, the statute provides that if the lead agency determines that the project will not have a significant effect on the environment, it "shall issue a negative declaration to that effect," *id.* § 21080(c), which briefly describes the reasons why a proposed project will not have a significant effect on the environment and does not require an environmental impact report. *Id.* § 21064.

As plaintiff points out, once the lead agency has issued a negative declaration, a responsible agency that believes the negative declaration is inadequate must take the necessary steps to challenge the lead agency's findings or otherwise be deemed to have waived any objection. Cal.Admin. Code tit. 14, § 15096(e). Among the options available to a dissatisfied local responsible agency are a challenge through the courts within 30 days of the lead agency's notice of determination, preparation of a subsequent environmental impact report if permissible under Section 15162, or assumption of the lead agency role as provided in Section 15052(a)(3). *Id.* A subsequent or supplemental environmental impact report may be required only where there are substantial changes in the proposed project, substantial changes in the circumstances under which the project is being undertaken, or significant new information about the project. Cal.Pub.Res. Code § 21166; Cal.Admin.Code tit. 14, § 15162. Alternatively, a responsible agency may assume the role of the lead agency where the lead agency prepared inadequate legal documents without consulting the responsible agency. *Id.* § 15052(a)(3).

The record reveals that the Department of Health Services was the lead agency on the Ogden project, that the Department fulfilled its statutory obligations as a lead agency under the California Environmental Quality Act, and that the City participated in the process as a responsible agency. Both the Department of Health Services and the City explicitly acknowledged that the Department would serve as the lead agency and the City would act as a responsible agency. (Plaintiff's Exhibit C at 2012; Plaintiff's Exhibit G at 241, 502). The Department of Health Services held an inter-agency meeting at which the City was represented (Plaintiff's Exhibit C at 2590) and issued an extensive Initial Study which concluded that "there is no substantial evidence that the project, as proposed to be permitted with mitigation measures, may have a significant effect on the environment." (Plaintiff's Exhibit C at 3089). On June 26, 1987, the City's Planning Department sent a letter to the Department of Health Services expressing its belief that the preparation of an environmental impact report was warranted and stating that the letter was "intended to fulfill the City's role as a responsible agency relative to the environmental review conducted by the State Department of Health Services." (Plaintiff's Exhibit C at 3545). After a public comment period on its proposed negative declaration, the Department of Health Services issued a final Negative Declaration together with a final Response to Comments on September 24, 1987. (Plaintiff's Exhibit C at 3045, 4030). There is no evidence in the record showing that the City attempted to challenge the Department of Health Services' determination in court or that any circumstances changed after the Negative Declaration was issued. In fact, the Planning Department explicitly recognized that the City is bound by the Department of Health Services' findings in the Negative Declaration absent one of the circumstances discussed above. (Plaintiff's Exhibit H at 581, 824–825).

Further, defendants do not attempt to argue in their opposition brief that the City can now challenge the adequacy of the findings by the Department of Health Services. Rather, defendants argue that the environmental impact report discussed at the City Council hearings and the environmental impact report requirement ultimately incorporated into the City's final Resolution on the Ogden project are not the same

as an environmental impact report defined by the California Environmental Quality Act. Defendants argue that nowhere in the record does the City Council indicate that it meant to require an "Environmental Impact Report" in compliance with the California Environmental Quality Act. Rather, the Council was aware of the binding nature of the Negative Declaration and merely meant to require further environmental review of the project. Defendants argue that "[t]he formal Council Resolution denying the [conditional use permit] ... is consistent with this interpretation in that it refers to an 'environmental impact report' and not an 'EIR' pursuant to [the California Environmental Quality Act]. (Defendant's Opposition at 19).

I find that the record does not support defendants' interpretation of the requirement imposed by the City Council on any future permit application. The record reveals that both opponents and councilmembers referred repeatedly to the need for an "EIR." (Plaintiff's Exhibit H at 865–866, 878, 889, 918, 922, 924, 926, 929, 936–937). Councilwoman McColl stated that local citizens are "asking for an EIR." (Plaintiff's Exhibit H at 969–970). Councilwoman Wolfsheimer stated that in order for Ogden to meet its burden of proof in any reapplication for a conditional use permit, "there would have to be an EIR" (Plaintiff's Exhibit H at 985) and Mayor O'Connor concluded:

> If you just allow them to reapply and don't require an EIR, what's the point? They're just going to get voted down again. An EIR will be required.

(Plaintiff's Exhibit H at 987). In a subsequent letter explaining the Council's decision, the Mayor stated that "the Council indicated it would not again consider Ogden's proposal unless it is accompanied by a complete Environmental Impact Report (EIR)." (Plaintiff's Exhibit H at 1028).

Even if this court were to accept defendants' unsupported distinction between an "environmental impact report" and an "EIR" under the California Environmental Quality Act, there is nothing in the record or even in defendants' motion papers which suggests what this theoretically more limited "environmental impact report" should contain. Under the California Environmental Quality Act and the implementing regulations, an environmental impact report is a detailed statement describing and analyzing the significant environmental effects of the project. Cal.Pub.Res.Code § 21061; Cal.Admin.Code tit. 14, § 15362. It is clear from the record as a whole that this is precisely the type of document that both opponents of the project and councilmembers were demanding. To allow the City to hinge its approval of the project on the submission of such a detailed report, under whatever name defendants choose to label it, would make a mockery of the statutory scheme constructed by the California Legislature under the statute.

■ Because "local agencies must act in accordance with state guidelines and the objectives of the CEQA," *Day v. City of Glendale*, 51 Cal.App.3d 817, 822, 124 Cal. Rptr. 569, 571 (1975), the issuance of a Negative Declaration by the Department of Health Services precludes the City from now requiring the submission of an environmental impact report or "EIR" for the Ogden project. Plaintiff has demonstrated that under the statute, the City has no grounds for imposing the environmental impact report requirement on Ogden and defendants have failed to point to any specific facts refuting this showing. Accordingly, summary judgment is granted in favor of plaintiff on the fifth cause of action. *See Celotex, supra,* 106 S.Ct. at 2553.

## IV. *Declaratory Relief*

In its claim of federal preemption, plaintiff alleges that it has suffered damages and requests compensatory damages in an unspecified amount, a request that is not at issue in this motion. However, in its twelfth cause of action, plaintiff has also asserted a claim for declaratory judgment based, in part, on its claim of federal preemption. In this motion, plaintiff has moved for summary judgment on the twelfth cause of action, requesting the court to declare that the City's Conditional Use Permit Ordinance as applied to Ogden is invalid and to order the City to issue a conditional use permit to Ogden.

While the court finds that defendants' particular actions to date are preempted

and that the City cannot properly require an environmental impact report, I do not hold that the City is precluded from reviewing the Ogden facility under its traditional land use authority. In light of the narrowness of this ruling, a declaratory judgment ordering defendants to issue the permit is inappropriate. The court holds only that the City was prohibited from denying the conditional use permit for the reasons it did, as revealed by the record. The only equitable remedy which follows from this limited holding is an order requiring the City to reopen Ogden's original permit application.

In sum, for the reasons discussed above, IT IS HEREBY ORDERED that summary judgment in favor of plaintiff is granted on the first and fifth causes of action in the complaint.

IT IS FURTHER ORDERED that summary judgment in favor of plaintiff is granted on the twelfth cause of action for declaratory judgment only to the extent that the court finds that defendants impermissibly denied a conditional use permit to plaintiff and orders defendants to reconsider plaintiff's permit application in a manner consistent with this decision.