**NORTH HAVEN PLANNING &
ZONING COMMISSION and
Scott Schatzlein, Plaintiffs,**

v.

**The UPJOHN COMPANY, Defendant.**

**Civ. No. N–89–526 (TFGD).**

United States District Court,
D. Connecticut.

May 31, 1990.

Michael Quinn, Robert K. Ciulla, Tyler, Cooper & Alcorn, Susan L. Jacobs, The Pellegrino Law Firm, New Haven, Conn., for plaintiffs.

S. Robert Jelley, Wiggin & Dana, John Parese, New Haven, Conn., for defendant.

## MEMORANDUM OF DECISION

DALY, District Judge.

The subject of this litigation is a sludge pile containing hazardous materials located on defendant's property in North Haven, Connecticut. The North Haven Planning and Zoning Commission ("the Commission") and Scott Schatzlein, its present Zoning Enforcement Officer ("plaintiffs") originally filed this action on October 19, 1989 in Superior Court in New Haven, Connecticut, seeking to enjoin the Upjohn Company ("defendant", "Upjohn") from implementing a plan capping the sludge pile and also requiring Upjohn to remove it. Defendant subsequently removed this case to federal court. 28 U.S.C. § 1441. On October 25, 1989, the Honorable José A. Cabranes denied plaintiffs' application for a temporary restraining order. On November 22, 1989, Upjohn answered plaintiffs' amended complaint, and also filed a counterclaim seeking to enjoin plaintiffs from enforcing any local regulations which prohibit Upjohn from implementing its closure plan and new wastewater treatment system. A consolidated hearing on plaintiffs' application for a preliminary injunction and trial on the merits of both parties' claims began on December 4, 1989, and concluded January 10, 1990. Both parties have submitted proposed findings of fact and conclusions of law, and the matter is now ripe for decision.

## FINDINGS OF FACT

The Upjohn Company, headquartered in Kalamazoo, Michigan, produces pharmaceuticals, agricultural products, and synthetic organic chemicals. Upjohn's North Haven, Connecticut facility, a medium-sized manufacturing plant, makes synthetic organic chemicals. The North Haven plant is bounded on its eastern side by the Quinnipiac River. Upjohn started production on this site in 1962.

### 1) THE PILE

A by-product of Upjohn's chemical manufacturing is a substantial quantity of wastewater. In 1968, Upjohn began adding lime to its wastewater so as to neutralize its waste, and channeling the water through a series of lagoons to permit any solids to settle before the water was discharged into the Quinnipiac River. Upjohn has modified these lagoons several times to improve its water treatment system. Upjohn also dredged the solids which had collected in the lagoons and, starting in 1973, began placing this waste material, known as sludge, on a portion of its property north of a certain lagoon which by that time contained an aeration device. By 1977 the resulting pile, known as the north sludge pile and the subject of this litigation, covered approximately 4.25 acres of Upjohn's property.

Upjohn continued to place sludge on this pile until April, 1985. The pile did not expand any further horizontally, but did grow vertically. By 1985, the pile stood approximately 40 feet above grade, and contained approximately 83,000 cubic yards of sludge. The pile is surrounded on all sides by a sloping earthen embankment and dikes. The material in the pile consists of, among other compounds, iron, iron oxides, silica, silica oxides, powdered activated carbon, sodium chloride, microorganisms, lead, dichlorobenzidene, dichloronitroauiline, other trace chemicals, and water. The materials in the pile are classified as hazardous waste under the Federal Resource Conservation Recovery Act ("RCRA"). 42 U.S.C. § 6901 et seq.

In April, 1985, as a result of adding a substantial amount of material that had not had a sufficient period to dry, the pile partially collapsed, damaging water treatment devices. Upjohn removed approxi-

mately 27,000 tons of material that had escaped from the pile, placed it in a temporary storage area, and subsequently took it off site. Some time after this accident, Upjohn implemented a treatment system which reduced the quantity of material being produced by approximately 90 percent. Upjohn stopped placing sludge on the north pile in April, 1985.

Upjohn hired Malcolm Pirnie, Inc. to evaluate the remedial alternatives for addressing the environmental problems posed by the north sludge pile. That firm reported in July, 1986, that carting the sludge away would cost $22,600,000, that incineration and carting would cost $19,700,000, and that chemical fixation and carting would cost $40,500,000. The firm also explained that capping the pile and leaving it in place would cost only $900,000. A similar report prepared in 1982 had estimated the cost of carting the sludge away at $12,000,000, with an additional $500,000 per year thereafter for sludge generated at the production rate at that time. There was testimony at trial that chemical manufacturers around the country utilize one or combinations of several options for onsite disposal of sludge: land piling (such as utilized by the defendant), land fill, land spreading or spraying, and land farming. Other manufacturers have inplemented recycle and reuse programs, and still others incinerate, though this was not popular until the 1980's due to the oil crises of the 1970's. Finally, some companies take their waste off site.

Upjohn chose to cap their pile, provided it could gain approval from the United States Environmental Protection Agency ("EPA"). The plan developed and modified by Malcolm Pirnie provides for capping the pile in two stages, which includes first adding six inches of gravel, and then replacing this layer with 24 inches of vegetated cover soil and a synthetic membrane. Malcolm Pirnie recommended the phased approach in order to more closely monitor the stability of the pile. The final cap will provide for a "higher degree of long-term integrity." Def's exh. 523 at 1–6. Under the plan, the capped pile and subsurface groundwater are to be monitored for hazardous waste leachate for the next thirty years. *Id.*

## 2) THE REGULATIONS

Since 1960, North Haven has had zoning regulations in effect which provide for permitted uses in industrial zones delineated within the town. The town's regulations are permissive in nature, meaning that only those uses which are expressly allowed are permitted. Upjohn's North Haven facility is located in an industrial zone designated IG–80. Upjohn's manufacturing processes have always been permitted in this zone. Since 1960, residents of an IG zone were also permitted to engage in "accessory uses customarily incidental to a permitted use on the same premises." Furthermore, since 1960, North Haven's regulations have provided that any non-conforming use lawfully existing at the effective date of the regulations or any amendment may be continued.

The Commission became aware of the manner in which Upjohn was disposing of its sludge sometime in the late 1970's. The Commission and Upjohn had numerous communications concerning the defendant's wastewater treatment and disposal system from that time through 1986. In 1983, the Commission sent a letter advising Upjohn that it had approved defendant's applications for permits concerning additions to the wastewater treatment system subject to certain conditions, including that Upjohn submit a plan and a timetable for the removal of all existing sludge. Pltf's exh. 32. The Town also amended its zoning regulations so as to provide "[n]o storage of any type … shall be permitted outside of an enclosed area without the expressed site plan approval of the Planning and Zoning Commission."

On June 3, 1985, Upjohn informed the Commission that it was about to implement a system reducing solid waste generation by 90 percent, and that it was investigating possible uses for the existing sludge, including ways to convert the sludge to nontoxic materials. Pltf's exh. 33. Upjohn also advised the Commission that it intended to pursue these options primarily, but

that it would dispose of material from the pile at a rate of one truckload per week. *Id.* The Commission replied that this course of action was unacceptable, and that unless Upjohn made a more substantial committment to removing the accumulated sludge, the Commission would be forced to issue a Cease and Desist Order. Pltf's exh. 33. On May 16, 1986, the North Haven Zoning Enforcement Officer formally informed Upjohn that it was in violation of the conditions attached to zoning approvals granted in February, 1983, and ordered it to cease and desist all outdoor storage of sludge on the property. Pltf's exh. 4. On May 23, 1986, the Commission informed the Connecticut Department of Environmental Protection ("DEP") that Upjohn was in violation of North Haven's zoning regulations. Pltf's exh. 3. Upjohn subsequently appealed the action of the Zoning Enforcement Officer to the Zoning Board of Appeals. That body upheld the Officer's actions. Thereafter, Upjohn appealed the Board's decision to the Connecticut Superior Court. *Upjohn Co. v. Zoning Bd. of Appeals of the Town of North Haven,* CV–86–0250632 (Conn.Super.Ct.). That appeal is still pending. Pltf's exh. 13A.

Since at least 1981, Upjohn contemplated closing the sludge pile when it reached capacity, which was estimated to be approximately 90,000 cubic yards. Def's exhs. 503, 505. In early 1986, Upjohn submitted its closure plan for the sludge pile, prepared by Malcolm Pirnie, Inc., to the EPA and DEP. As described above, this plan proposed capping the pile, and did not propose removal of the material. After receiving comments concerning this plan, Upjohn submitted revised plans in January, 1988, and again in July, August, and September, 1989. Counsel for plaintiffs sent a letter to the EPA and DEP on March 28, 1988, commenting on the proposed capping plan. Pltf's exh. 13A at ¶ 10. Plaintiffs also testified at a hearing held by the EPA and DEP on June 15, 1988 addressing the plan. Id. at ¶ 11. On September 29, 1989, the DEP and EPA formally approved Upjohn's capping plan. Def's exh. 524.

On June 15, 1988, the DEP Commissioner issued an Order requiring Upjohn to take all steps necessary to install certain wastewater treatment facilities as required to comply with the applicable state water pollution discharge regulations. Def's exh. 522 at A. The Order further provided that noncompliance with these provisions would result in monetary penalties. *Id.* Upjohn subsequently applied to the Commission for permits to make modifications to its wastewater treatment system. Pltf's exh. 13A at ¶¶ 15 & 16. At a January 17, 1989 meeting, the Commission denied these applications solely on the basis of the alleged zoning violations; i.e., the sludge pile. *Id.* at ¶ 17. Plaintiffs concede that absent these violations, Upjohn's applications met the requirements of the zoning regulations. Pltf's Post–Trial Brief at 37–38.

Upjohn's capping plan includes activities such as regrading and excavation which also require permits and approvals under the town's zoning regulations. Upjohn has not applied for, nor received these permits or approvals. Nevertheless, Upjohn recently began to implement the first stage of its capping plan. Shortly after the conclusion of trial, Upjohn announced its intention to close its North Haven manufacturing facility.

## CONCLUSIONS OF LAW

Plaintiffs' argument is essentially that: (1) Upjohn has begun certain work pursuant to the closure plan which requires permits and approvals from the Commission, which Upjohn has neither applied for nor received; and, (2) the presence of the sludge pile on the defendant's property is in violation of town zoning regulations and the Zoning Enforcement Officer's Cease and Desist Order. Plaintiff seeks an order enjoining the implementation of the closure plan, and requiring Upjohn to bring the property into compliance with the zoning regulations.

Defendant claims: (1) the provisions of RCRA and the EPA/DEP Approval preempt the plaintiffs' order requiring removal of the pile; 2) the provisions of RCRA and the DEP/EPA Approval preempt the plaintiffs from enforcing the

zoning regulations so as to prevent implementation of the closure plan, or from denying the necessary permits on the basis of the existence of the pile on the premises; (3) the June 15, 1988 DEP Order preempts the Commission from denying the applications concerning the wastewater treatment system; and, (4) the sludge pile is not a zoning violation. Upjohn seeks an order enjoining the plaintiffs from enforcing the Cease and Desist Order, from enforcing the town zoning regulations so as to prevent it from implementing the interim phase of the closure plan, and to prevent the plaintiffs from denying applications for wastewater treatment system additions.

At the outset, the Court observes that despite the many issues the parties have presented for resolution, the Court shall only examine whether Upjohn need apply for certain permits, and the effects of its failure to so apply.

■ There are several reasons why the Court limits its evaluation to these areas. First, Upjohn has appealed the decision of the North Haven Zoning Board of Appeals upholding the Commission's finding that the pile constitutes a zoning violation, and that case is still pending in Connecticut Superior Court. *See supra.* Local land use decisions have repeatedly been held to be issues of local concern. *Northeast Mines, Inc. v. Smithtown,* 584 F.Supp. 112, 114–15 (E.D.N.Y.1984) (citing *Louisiana Power & Light Co. v. Thibodaux,* 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959)). Accordingly, resolution of Upjohn's contention that it has not committed a zoning violation is not properly before this Court. *Id.* For purposes of this dispute, the Court must consider that, as matters currently stand, the presence of the pile on the Upjohn property constitutes a zoning violation.

■ Second, the Court shall not resolve the defendant's contention that the Order issued on June 15, 1988 by the DEP pursuant to the Connecticut Water Pollution Control Act, Connecticut General Statutes § 22a–416 *et seq.,* preempts the Commission from denying Upjohn's applications to make wastewater treatment system improvements. The Commission has conceded that the applications were satisfactory in all respects, but that the permits could not be issued until Upjohn remedied the existing zoning violation.

The present record casts serious doubt on the merits of Upjohn's suggestion that unless it is allowed to make the needed improvements it cannot avoid violation of Connecticut law. There is nothing to prevent Upjohn from ceasing operations which produce illegal discharge. Furthermore, the terms of the Order require Upjohn to "take such action as is necessary" to install the required equipment. Def's exh. 522 at A. Remedying the existing zoning violation would enable Upjohn to obtain the needed permits. *See* pltf's exh. 13A at ¶ 17 (applications denied solely on basis of alleged illegal existence of pile). More significantly, however, the Court notes that defendant presented this exact question—whether the DEP Order preempts local regulations—to the Connecticut Superior Court in a motion to strike the complaint in *Carothers v. Upjohn Co., Inc.,* No. CV 89–0363075 S (Conn.Super.Ct. July 13, 1989). As there is thus an ongoing state judicial proceeding considering this issue, and as these questions concern important state interests, and are of peculiarly local concern, resolution of how local zoning regulations should be construed in light of state law is best left to the state judiciary, given the circumstances of this case. *See Middlesex County Ethics Committee v. Garden State Bar Association,* 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982); *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); and *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). Accordingly, the Court abstains from considering the merits of defendant's claim in this regard.

Nothing precludes the Court from resolving the question of federal preemption, however, nor any of the other issues which the parties have not raised elsewhere. Accordingly, the Court now turns to these questions.

The capping plan calls for the addition of gravel and top soil to the sludge pile, as

well as excavation and regrading, and the placement of collection and test wells, among other things. The North Haven Zoning Regulations require residents who intend to perform such activities to apply for and obtain permits. Pltf's exh. 3 at § 8.1 *et seq.* Upjohn has begun construction pursuant to its plan. It has neither applied for nor obtained such permits. Plaintiffs' amended complaint asserts that implementation of the capping plan will constitute new zoning violations and increase the size and scope of the already existing zoning violations.

■ Connecticut General Statutes § 8–12 provides that a town's zoning enforcement officer may institute an action to prevent the violation of zoning regulations. This section also provides for the issuance of an injunction to remedy a violation of local zoning regulations. Accordingly, as a plaintiff in such an action, the zoning enforcement officer need not show irreparable harm or the lack of an adequate remedy at law to obtain an injunction preventing the violation. *Johnson v. Murzyn*, 1 Conn. App. 176, 179–81, 469 A.2d 1227, *cert. denied*, 192 Conn. 802, 471 A.2d 244 (1984) (enactment of statute assumes that no adequate alternative remedy exists and that injury is irreparable); *see also United States v. Diapulse Corp. of America*, 457 F.2d 25 (2d Cir.1972) (same).

Upjohn argues that it need not obtain any permits from plaintiffs to implement its capping plan since the Commission cannot issue approvals due to its determination that there is an existing zoning violation on the site. The defendant also argues that the EPA/DEP approval compels it to implement its closure plan, but that the zoning regulations and the Commission's actions prohibit Upjohn from beginning work. Defendant claims that since compliance with both federal and local law is impossible, local law is preempted.

■ The only support defendant cites in support of its first argument—that since the Commission will deny the permits it need not apply—is *Kosinski v. Lawlor*, 177 Conn. 420, 425, 418 A.2d 66 (1979). In that case the plaintiff sought a writ of manda-mus directing the local planning and zoning commission to approve a proposed site plan. *Id.* at 422, 418 A.2d 66. On appeal, the Connecticut Supreme Court rejected defendants' argument that in order to obtain such relief the plaintiff needed to first apply for and be denied building permits. *Id.* at 425–27, 418 A.2d 66. As this defendant correctly notes, the Court wrote that it would not require the exhaustion of an administrative remedy when that remedy is either inadequate or futile. *Id.* at 425, 418 A.2d 66. Contrary to defendant's implication, however, this decision and the indicated language in no way sanction a party to ignore any zoning regulations and proceed without necessary authorization simply because an application would be denied. Rather, the case suggests that courts may review the merits of an application if administrative denial is sufficiently definite. *Id.* Adopting defendant's suggestion would permit any resident to engage in a land use without authorization so long as he or she could be certain that the use would not be permitted, an untenable result. Defendant's contention that it need not have applied for the appropriate permits and approval on this ground is, therefore, without merit.

The defendant has also claimed, however, that federal law preempts the local requirements, and has filed a counterclaim seeking to restrain the plaintiffs from enforcing the regulations so as to prevent Upjohn from implementing the plan, or from enforcing the Cease and Desist Order. Thus, the Court needs to resolve whether RCRA and the EPA/DEP Approval preempt the local zoning regulations and the Commission in these respects.

■ Under the Supremacy Clause of the Constitution, federal law may preempt state and municipal law in several different ways. *See generally Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 712–13, 105 S.Ct. 2371, 2374–75, 85 L.Ed.2d 714 (1985); *Pacific Gas and Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 203–04, 103 S.Ct. 1713, 1721–22, 75 L.Ed.2d 752 (1984); *Environmental*

*Encapsulating Corp. v. New York City,* 855 F.2d 48, 53 (2d Cir.1988). Congress may preempt state or local law by so stating in explicit terms on the face of a statute. *Adams Fruit Co., Inc. v. Barrett,* —— U.S. ——, ——, 110 S.Ct. 1384, 1386–88, 108 L.Ed.2d 585 (1990) (citing *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977)). Absent such express language, preemption will be implied where federal legislation is so comprehensive in a given area as to leave no room for supplemental state or local legislation. *International Paper Co. v. Ouellette,* 479 U.S. 481, 491, 107 S.Ct. 805, 811, 93 L.Ed.2d 883 (1987). Finally, even if Congress has not displaced state or local action in an area, state or local law is displaced to the extent that it actually conflicts with federal law, or with congressional purposes and goals. *Florida Lime and Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963). A local regulation that frustrates a federal scheme is preempted. *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 747, 105 S.Ct. 2380, 2393, 85 L.Ed.2d 728 (1985). As to the third type of preemption—actual conflict, or frustration of congressional purposes—there is no rigid formula to determine whether a local regulation conflicts with federal law. *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941) (Court has used variety of expressions in considering validity of state laws in light of federal law, including "irreconcilable" and "repugnant", as well as "different" and "inconsistent").

In amending RCRA in 1984, Congress expressly declared "the national policy of the United States [to be] that wherever feasible, the generation of hazardous waste is to be reduced or eliminated as expeditiously as possible ... [w]aste that is nevertheless generated should be treated, stored, or disposed of so as to minimize the present and future threat to human health and the environment." 42 U.S.C. § 6902(b). Congress, however, neither expressly preempted nor impliedly occupied the entire field of hazardous waste regulation through RCRA. *Ogden Environmen-*

*tal Services v. San Diego,* 687 F.Supp. 1436, 1444 (S.D.Cal.1988). In fact, one of RCRA's express objectives is to establish a cooperative effort among the federal, state, and local governments and private enterprise to carry out the purposes of the Act. 42 U.S.C. § 6902(a)(7).

RCRA has a "savings" clause to promulgate this cooperation which provides "[n]othing in this chapter shall be construed to prohibit any State or political subdivision thereof from imposing any requirements, including those for site selection, which are more stringent than those imposed by such (RCRA and EPA) regulations." 42 U.S.C. § 6929.

Although courts within this circuit have not addressed the question of federal preemption posed in this case, courts from other circuits have considered the effect of RCRA regulations and EPA approvals pursuant to RCRA authorization upon local regulations. The Eighth Circuit considered the effect of the RCRA savings clause in a county's defense of an ordinance in the face of a preemption claim. *ENSCO, Inc. v. Dumas,* 807 F.2d 743 (8th Cir.1986). In that case, after the EPA passed regulations governing the incineration and disposal of certain hazardous wastes pursuant to RCRA authorization, ENSCO announced that it would seek EPA certification to incinerate the wastes governed by such regulations at its Union County, Arkansas facility. *Id.* at 744. The County subsequently passed an ordinance which provided, among other things, that the hazardous wastes covered by the regulations could not be "stored, treated, or disposed of within the County." *Id.* ENSCO brought suit challenging the validity of the ordinance. *Id.* The district court found for ENSCO. *Id.*

On appeal, the Eighth Circuit affirmed the district court's decision, holding that RCRA preempted enforcement of the ordinance. *Id.* at 745. While acknowledging that the language in the RCRA savings clause indicated that Congress had not preempted all local regulations, the Eighth Circuit held that the ordinance stood in conflict with the purposes and objectives of

RCRA. *Id.* at 744–45. The county's ban on the materials altogether ignored that these particular hazardous wastes exist. *Id.* at 745. In essence, the County's ban mandated that the wastes would not be handled in the manner deemed safest by RCRA and the EPA. *Id.* As to the savings clause, the Eighth Circuit wrote "[a] county cannot, by attaching the label 'more stringent requirements' or 'site selection' to an ordinance ..., arrogate to itself the power to enact a measure that as a practical matter cannot function other than to subvert federal policies...." *Id.*

The Southern District of California also considered a situation akin to the one presented here in *Ogden.* 687 F.Supp. at 1436. Pursuant to RCRA regulations, Ogden applied to the EPA for permission to conduct hazardous waste incineration testing in San Diego. *Id.* at 1438. After extensive consideration of the proposal, the EPA approved the project. *Id.* Subsequently, the City Council passed an ordinance requiring a conditional use permit for any facility, activity, or use of property "which is required by federal law to obtain a ... permit from the EPA ... pursuant to [RCRA]." *Id.* at 1440. Ogden applied for such a permit. *Id.* Ultimately, after extensive discussion which included testimony from EPA representatives, the City Council voted to deny Ogden's application. *Id.* at 1441. Ogden subsequently brought suit, claiming RCRA and the EPA approval preempted the City's action. *Id.*

The Court upheld the plaintiff's claim, finding that RCRA and the EPA approval preempted the Council from denying the permit on the basis of generalized safety concerns, where the EPA had already found safety risks to be acceptable. *Id.* at 1447–1450. The Court found that while the RCRA savings clause provided for local adoption of more stringent environmental standards, and expressly provided for local governments to play a role in site selection, the city's action in this case stood as an obstacle to clear congressional purposes. *Id.* In evaluating the effect of the savings clause, the Court noted that the *ENSCO* decision stood for the principle that local governments cannot directly subvert

RCRA and EPA decisions through outright bans on activities federal authorities consider safe. *Id.* at 1446. The Court then observed that requiring the application for a use permit, rather than an outright ban, created the potential for subterfuge, permitting a local government "to do indirectly what the ENSCO court found the City cannot do directly." *Id.* Nevertheless, the Court also wrote that to construe every permit denial as creating a *de facto* conflict with congressional objectives would substantially eviscerate the role of local governments in choosing one site over another, a role presumably envisioned by the savings clause. *Id.* Ultimately, the Court ruled that, on the record in that case, the stated reasons for the city's denial of the permit were insufficient. *Id.* at 1449.

The Court now turns to the federal and local law allegedly in conflict in this case. To accomplish the federal goal of sound hazardous waste management, RCRA requires a producer of hazardous waste to develop and submit for EPA approval a plan for closure of the hazardous waste site. *See* 40 C.F.R. § 265.112. Specifically, any owner or operator of a hazardous waste site must close the facility in a manner which minimizes the need for maintenance of the site and controls or eliminates, to the extent necessary to protect human health and the environment, post-closure escape of the types of waste addressed by RCRA. *Id.* at § 265.111. It is clear from the text of the Act that closure can be accomplished through any means approved by the EPA, including the removal of hazardous materials. *See* 40 C.F.R. § 265.113(a).

The EPA/DEP Approval cited by the defendant provides that Upjohn's proposed plan complies with RCRA and Connecticut hazardous waste site closure requirements. Def's exh. 524.

■ The North Haven Zoning Regulations at issue, as described above, do not specifically address *hazardous* waste storage or disposal. One set of regulations at issue concerns the necessity of permits and approval for excavation and construction.

Pltf's exh. 3 at 3.26, 3.27. More generally, the regulations require site plan approval for any change in use of a property. *Id.* at 3.27(a). The regulations also provide a procedure through which applications for such approvals are made. *Id.* at 3.27.2 *et seq.* The regulations further provide that the Commission shall not approve a site plan unless all of the town regulations are met. *Id.* at 3.27.1. RCRA does not specifically address any of these issues. Nor does the Court find that simply requiring such approval and permits frustrates congressional purposes. *See Ogden,* 687 F.Supp. at 1445 (requirement of use permit is not *per se* preempted); *cf. Pacific Gas & Electric,* 461 U.S. at 190, 103 S.Ct. at 1715–16 (Congress' inclusion of savings clause indicated intent for states to retain traditional responsibilities in field).

■ The town regulations, as interpreted by the Commission and the Zoning Enforcement Officer, do not provide for the storage of this type of waste on property such as defendant's, absent express permission from the Commission. *See* Pltf's exh. 13A at ¶ 8 (Cease and Desist Order issued and upheld). Recently, the town has amended the regulations to explicitly provide that plots within the town shall not be used to store waste products unless enclosed within a building absent the expressed site plan approval of the Commission. Pltf's exh. 3 at 3.27.2.24. The Commission may grant approval of such activity, after having considered the activity's impact upon public safety, health, sanitation and aesthetics. *Id.* Although RCRA obviously addresses these matters, it expressly provides for the establishment of more stringent local standards, and for local participation in site selection. 42 U.S.C. § 6929. Thus, since the provisions of RCRA and the town regulations are not themselves in conflict, to determine whether RCRA and the EPA/DEP Approval preempt the local regulations, the Court must examine whether the local activity in this field frustrates Congress' goals and purposes. *See Florida Lime and Avocado Growers,* 373 U.S. at 132, 141, 83 S.Ct. at 1210, 1216–17.

The Court first notes that this situation is dissimilar from the one presented in *ENSCO.* The town has not passed any ban in response to federal approval of certain activity. In other words, this case does not present a direct challenge to a federal determination.

Moreover, this case is unlike the situation presented in *Ogden.* First, concerning the capping plan, the defendant has not even applied to the town to use its property in the manner approved by the EPA and DEP. The exact holding of *Ogden,* that the city council failed to provide adequate reasons for denying the permit, is therefore inapplicable. Even assuming Upjohn applied, the town has offered a reason for denying the permit—the pre-existing zoning violation. Second, in *Ogden* the city denied the permit after the federal agency approved Ogden's plan. Here, after extensive interaction, the Commission found Upjohn in violation of the regulations before the defendant sought federal approval of its plan. The Commission's actions in no way indicate even an indirect challenge to federal authority.

Finally, although the Commission requires the defendant to remove the materials, rather than conduct the federally approved activities on its own property, the town has not banned this type of activity within the town. Quite to the contrary, the recent amendment of the regulations explicitly provides for residents to apply to the Commission to operate and close hazardous waste sites within the town, and provides for the Commission to evaluate the applications considering certain factors. Pltf's exh. 3 at 3.27.2.24. Rather than conflicting with RCRA, this would seem to be the exact sort of site selection process, or application of more stringent standards, envisioned by the savings clause. 42 U.S.C. § 6929. In sum, for all of the foregoing reasons, the Court finds that the local regulations are not preempted by RCRA.

■ Upjohn's argument that the Approval constitutes an EPA determination that Upjohn's plan represents the most sound environmental action, and therefore any obstacle to its implementation is an obstacle

to congressional goals is also not persuasive. There are many methods in which a hazardous waste site might be closed in accordance with RCRA, including removal. *See* 40 C.F.R. § 265.113(a). The language of the Approval contains no indication that the EPA or DEP has determined that this method of closure is the *most* environmentally protective. *See* Def's exh. 524. Furthermore, the conclusion that the EPA and DEP simply determined that federal and state standards were satisfied by the plan is supported by the fact that these agencies issued an Approval, rather than an order. Indeed, in a different context the defendant points out that the EPA had the power to issue an order requiring Upjohn to remove the material. Def's Post-Trial Brief at 18. The Court refuses to draw a conclusion from the fact that the agencies issued the Approval with knowledge that the Commission considered the presence of the unclosed pile a zoning violation. The Court also notes that the language of the Approval itself includes that it does not relieve Upjohn from obtaining any further authorizations required by the Connecticut General Statutes, which provide for the enactment of local zoning regulations. CONN. GEN.STAT. §§ 8–1, 8–2. For all of the foregoing reasons, and in light of the RCRA savings clause providing for a role for local government, the Court finds that the Approval does not preempt the Commission's actions or the local zoning requirements.

## CONCLUSION

For all of the foregoing reasons, the Court finds that the zoning regulations of the town of North Haven are not preempted by federal law or federal action. Accordingly, the relief plaintiff seeks is hereby GRANTED in part, such that Upjohn is hereby ENJOINED from implementing its temporary or final closure plan of the north sludge pile until such time as it has obtained the necessary permits from the Commission. Furthermore, for all of the foregoing reasons, the relief sought by defendant in its counterclaim is hereby DENIED. Finally, the Court hereby abstains from considering the remainder of the relief sought by plaintiffs or defendant.

SO ORDERED.