BLUE CIRCLE CEMENT, INC.,
Plaintiff–Appellant,

v.

BOARD OF COUNTY COMMISSIONERS
OF the COUNTY OF ROGERS,
Defendant–Appellee.

No. 92–5174.

United States Court of Appeals,
Tenth Circuit.

June 22, 1994.

Charles W. Shipley of Shipley, Inhofe & Strecker, Tulsa, OK (Douglas L. Inhofe, Blake K. Champlin, and Mark A. Waller, with him on the brief) for plaintiff-appellant.

Bill M. Shaw, Asst. Dist. Atty., Claremore, OK (Gene Haynes, Dist. Atty., with him on the brief) for defendant-appellee.

Before EBEL, SETH, and KELLY, Circuit Judges.

EBEL, Circuit Judge.

This case arises from a municipality's exercise of its zoning authority to regulate hazardous waste disposal, recycling, and treatment within its borders. The Plaintiff–Appellant, Blue Circle Cement, Inc. ("Blue Circle"), raises both federal constitutional and state law challenges to the hazardous waste zoning ordinance enacted by the Defendant–Appellee, the Board of County Commissioners of Rogers County, Oklahoma (the "Board"). The district court upheld the Board's ordinance in a summary judgment order. We have jurisdiction under 28 U.S.C. § 1291 to consider the four questions raised in Blue Circle's appeal: (1) whether the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq., preempts the Board's ordinance; (2) whether the ordinance violates the Commerce Clause of the United States Constitution; (3) whether subjecting Blue Circle to the Board's amendment to the ordinance would be inequitable under *In re Julius Bankoff,* —— Okl. ——, 875 P.2d 1138 a recent decision of the Oklahoma Supreme Court; and (4) whether the Board's amendment to the ordinance constituted an unlawful exercise of police power.[1] Because we conclude that the court erred in its evaluation of the RCRA preemption and Commerce Clause claims, and thus erred in granting summary judgment, we reverse and remand for further proceedings.

## I. Background

Blue Circle, an Alabama corporation with its principal place of business in Georgia, operates a quarry and cement manufacturing plant in Rogers County, Oklahoma. Since opening this facility in 1960, Blue Circle has used coal and natural gas as fuel in its cement kilns. To reduce the cost of heating its kilns, Blue Circle sought to convert to Hazardous Waste Fuels ("HWFs"), which are

1. Underlying many of Blue Circle's issues is the complaint that the district court improperly converted the Board's motion to dismiss into one for summary judgment without affording Blue Circle notice or an adequate opportunity to present material facts in dispute. As our discussion of the RCRA preemption and Commerce Clause issues indicates, we conclude that because important factual issues remain unresolved, it was error to grant summary judgment in favor of the Board on these issues.

derived from the blending of various industrial wastes and possess high British Thermal Unit ("BTU") value.[2] The Board's regulatory actions in direct response to Blue Circle's proposed fuel conversion project gave rise to this dispute.

Initially, Blue Circle concluded that the Board's approval to use HWFs was unnecessary. The zoning ordinance in effect when Blue Circle commenced its fuel conversion project in the early 1980s required industrial operators to obtain a conditional use permit to establish an "industrial waste disposal" site. See § 3.13.2 of the City of Claremore–Rogers County Metropolitan Planning Commission Zoning Ordinance (the "Ordinance"). Blue Circle contended that burning HWFs in its cement kilns constituted "recycling" or "burning for energy recovery," not disposal. Because the Ordinance made no mention of recycling operations, Blue Circle argued that it was free to purchase, store, and burn HWFs at its site without first obtaining a conditional use permit. To accomplish the conversion, Blue Circle incurred design, engineering, and planning expenses in preparation for the switch to HWFs. The company entered into an agreement with CemTech, Inc., contingent upon obtaining the necessary governmental approval, to construct a storage area for HWFs and to supply HWFs to its Rogers County facility.

However, the Board disagreed with Blue Circle's interpretation of the Ordinance and informed company officials that burning HWFs in the cement kilns required a conditional use permit. On August 12, 1991, the Board adopted an advisory resolution stating that "there is no distinction between a hazardous waste alternative fuel burning facility as a recycling facility or an industrial waste disposal site or hazardous waste incinerator." The regulatory force of this advisory resolution remains uncertain, but the Board explained its action as an effort to thwart Blue

Circle's attempt to circumvent the conditional use permit requirement under the original terms of § 3.13.2.

On August 21, 1991, rather than apply for a conditional use permit to burn HWFs at its cement plant, Blue Circle filed suit in the United States District Court for the Northern District of Oklahoma, seeking a declaratory judgment under 28 U.S.C. § 2201 that the use of HWFs did not constitute industrial "disposal." On December 2, 1991, while Blue Circle's suit was pending, the Board ended any ambiguity about the characterization of Blue Circle's use of HWFs by amending the Ordinance to include "recycling" and "treatment" sites among those facilities for which the Ordinance requires a conditional use permit. By this express language, the Board unequivocally subjected hazardous waste recycling and treatment to the same regulatory and permit scheme that was applicable to industrial waste disposal.

Blue Circle then filed an amended complaint alleging that the Ordinance as amended was preempted by RCRA, was violative of the Commerce Clause, and could not equitably be applied to Blue Circle because the company had commenced its fuel conversion project while the former ordinance was in effect. On June 23, 1992, the district court denied Blue Circle's two summary judgment motions, denied the Board's motion to dismiss, and scheduled the case for a bench trial to be held on August 3, 1992.

On the eve of the scheduled trial, however, and without affording the parties prior notice, the court removed the case from its docket. On August 4, 1992, the court sua sponte issued a summary judgment order in favor of the Board. The court held that: (1) RCRA did not preempt the Board's zoning Ordinance; (2) the Ordinance did not violate the Commerce Clause of the United States Constitution; and (3) the Board's amended ordinance was constitutional as applied to

2. By one estimate, at least twenty-three cement manufacturing plants in the United States and Canada operate with HWFs. Aplt.App. at 134. See LaFarge Corp. v. Campbell, 813 F.Supp. 501, 504 n. 5 (W.D.Tex.1993) (noting that HWFs are used in cement kilns, blast furnaces, coke ovens, sulfur recovery furnaces, and industrial boilers). Pursuant to 42 U.S.C. 6924(q)(1), Congress directed the Environmental Protection Agency ("EPA") to promulgate regulations to establish national standards for owners and operators of industrial furnaces that burn HWFs. See 40 C.F.R. § 266.100 Subpart H (entitled "Hazardous Waste Burned in Boilers and Industrial Furnaces").

Blue Circle because Blue Circle had not acquired a vested right to use HWFs at its plant prior to the amendment. We will review in turn each of the district court's rulings which were raised in Blue Circle's timely appeal.

## II. Conversion to a Summary Judgment Order

■ We review de novo the district court's summary judgment order and apply the same legal standard used by the court under Fed.R.Civ.P. 56(c). *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Our de novo standard of review applies both to the court's federal constitutional legal conclusions and its determination of state law. *Mares v. ConAgra Poultry Co.,* 971 F.2d 492, 495 (10th Cir.1992). In applying this standard, we construe the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *United States v. Hardage,* 985 F.2d 1427, 1433 (10th Cir.1993).

Before addressing the merits of Blue Circle's challenge to the Ordinance, we must consider the procedural history of this litigation and Blue Circle's contention that the district court's procedures prejudiced it.

After Blue Circle filed its original complaint on August 21, 1991, the Board moved to dismiss under Fed.R.Civ.P. 12(b)(6) on September 9, 1991. One day later, Blue Circle moved for summary judgment. While both motions were still pending before the district court, Blue Circle filed an amended complaint on August 22, 1992. The court next convened a pretrial conference on June 23, 1992, during which it denied both the Board's original motion to dismiss and Blue Circle's summary judgment motion. The court scheduled a bench trial for August 3, 1992. In lieu of the scheduled bench trial, however, the court sua sponte reversed its denial of the Board's Rule 12(b)(6) motion to dismiss, converted it into one for summary judgment under Rule 56, and upheld the Ordinance on all grounds. Order of August 4, 1992.

Rule 12(b) authorizes a court to treat a motion to dismiss as one for summary judgment, provided that the court affords the parties a "reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed.R.Civ.P. 12(b). Rule 56(c) grants the non-moving party ten days to accumulate evidence demonstrating the existence of a genuine issue of material fact prior to the court's evidentiary hearing. We have held that a court's failure to comply with the notice requirements when changing a Rule 12(b) motion to one for summary judgment may constitute reversible error. *See Ohio v. Petersen, Lowry, Rall, Barber & Ross,* 585 F.2d 454, 457 (10th Cir.1978); *Torres v. First State Bank of Sierra County,* 550 F.2d 1255, 1257 (10th Cir.1977); *Adams v. Campbell County School District,* 483 F.2d 1351, 1353 (10th Cir.1973).

■ What drove our analysis in these cases was the obvious prejudice that inures to the non-moving party when, faced with a Rule 12(b)(6) motion, the court consults materials outside the complaint, yet deprived the non-moving party "the opportunity to be heard ... to present controverting material and ... to amend." *Adams,* 483 F.2d at 1353. However, a court's failure to comply with the notice requirements of Rule 56 constitutes harmless error if the dismissal can be justified under Rule 12(b)(6) standards without reference to matters outside the plaintiff's complaint. *Miller v. Glanz,* 948 F.2d 1562, 1566 (10th Cir.1991).

Here, we can review the district court's legal rulings because the parties had fully briefed the RCRA preemption, Commerce Clause, and state law issues in the context of Blue Circle's summary judgment motion. We conclude that the court erred with regard to some of the critical legal rulings. Moreover, it is apparent that there remain genuine disputes of material fact and that Blue Circle was prejudiced by being denied the opportunity to present its own factual mate-

rials in opposition to summary judgment against it. Therefore, we reverse the summary judgment and remand for further proceedings.

### III. RCRA Preemption

In our review of the merits of Blue Circle's challenge to the Rogers County Ordinance, we first assess whether RCRA preempts the Ordinance's restrictions on hazardous waste treatment and recycling within the County. This inquiry requires us to consider RCRA's division of hazardous waste regulatory authority between the federal government, on the one hand, and States and their political subdivisions, on the other.

### A.

The Supreme Court's jurisprudence under the Supremacy Clause of the United States Constitution identifies both express and implied forms of federal preemption, which are "compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Gade v. National Solid Wastes Management Ass'n,* —— U.S. ——, ——, 112 S.Ct. 2374, 2383, 120 L.Ed.2d 73 (1992) (quoting *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977)).[3] As the Court in *Gade* explained,

> Absent explicit pre-emptive language, we have recognized at least two types of implied preemption: field pre-emption, where the scheme of federal regulation is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," [*Fidelity Federal Savings & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982) ] ... and conflict preemption, where "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43 [83 S.Ct. 1210, 1217, 10 L.Ed.2d 248]

(1963), or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67 [61 S.Ct. 399, 404, 85 L.Ed. 581] (1941).

*Id.*[4]

■ Here, although there may very well be both express and implied preemption by RCRA of more permissive state and local regulations pertaining to hazardous wastes, it is clear that we have neither express preemption nor implied field preemption of state and local hazardous waste regulations that are more restrictive than RCRA. Under § 6929 of RCRA, Congress expressly empowers state and local governments to adopt solid and hazardous waste management regulations that are "more stringent" than those imposed on the federal level by the Environmental Protection Agency ["EPA"] pursuant to RCRA. Section 6929 provides in pertinent part:

> [N]o State or political subdivision may impose any requirements *less stringent* than those authorized under this subchapter respecting the same matter as governed by such regulations.... Nothing in this subchapter shall be construed to prohibit any State or political subdivision thereof from imposing any requirements, including those for site selection, which are *more stringent* than those imposed by such regulations.

42 U.S.C. § 6929 (emphasis added). Accordingly, Congress explicitly intended not to foreclose state and local oversight of hazardous waste management more strict than federal requirements. *Old Bridge Chemicals, Inc. v. New Jersey Dept. of Environmental Protection,* 965 F.2d 1287, 1292 (3d Cir.) ("[A]lthough waste management may be an area of overriding national importance, in legislating in the field Congress has set only a floor, and not a ceiling, beyond which states may go in regulating the treatment, storage,

---

3. The Supremacy Clause mandates that "the Laws of the United States ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

4. "[F]or the purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed in the same way as that of statewide laws." *Hillsborough County v. Automated Medical Lab., Inc.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985).

and disposal of solid and hazardous wastes."), *cert. denied,* —— U.S. ——, 113 S.Ct. 602, 121 L.Ed.2d 538 (1992); *ENSCO, Inc. v. Dumas,* 807 F.2d 743, 744–45 (8th Cir.1986) (same); *LaFarge Corp. v. Campbell,* 813 F.Supp. 501, 508 (W.D.Tex.1993) (same); *North Haven Planning & Zoning Comm'n v. Upjohn Co.,* 753 F.Supp. 423, 429 (D.Conn.) (same), *aff'd,* 921 F.2d 27 (2d Cir.1990), *cert. denied,* 500 U.S. 918, 111 S.Ct. 2016, 114 L.Ed.2d 102 (1991). *See also City of Philadelphia v. New Jersey,* 437 U.S. 617, 620–21 n. 4, 98 S.Ct. 2531, 2534 n. 4, 57 L.Ed.2d 475 (1978) (concluding that neither the statutory language of RCRA nor its implicit legislative design demonstrate congressional intent to preempt the entire field of waste management).

Thus, if the Board's ordinance were to run afoul of the Supremacy Clause, it would only be because of the form of implied preemption that precludes a state or local regulation from frustrating the full accomplishment of congressional purposes embodied in a federal statute—in this case, RCRA. *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

■ In order to determine whether this Ordinance frustrates the purposes of RCRA, we must consider "whether [the local] regulation is consistent with the structure and purpose of the [federal] statute *as a whole.*" *Gade,* —— U.S. at ——, 112 S.Ct. at 2383 (emphasis added); *Colorado Public Utilities Comm'n v. Harmon,* 951 F.2d 1571, 1580 (10th Cir.1991) (posing test as whether state law "stands as an obstacle to the accomplishment and execution of the *full purposes and objectives* of Congress") (quoting *Hillsborough County v. Automated Medical Lab., Inc.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985)).

### B.

RCRA is the comprehensive federal hazardous waste management statute governing the treatment, storage, transportation, and disposal of hazardous wastes which have adverse effects on health and the environment.[5] Enacted in 1976, RCRA authorized a multi-faceted federal regulatory, permit, and enforcement regime to address the "overriding concern of ... the effect on the population and the environment of the disposal of discarded hazardous wastes—those which by virtue of their composition or longevity are harmful, toxic or lethal." H.R.Rep. 94–1491, 94th Cong., 2d Sess. at 3 (1976), *reprinted in,* 1976 U.S.C.C.A.N. 6238, 6241.

One of RCRA's stated purposes is to assist states and localities in the development of improved solid waste management techniques to facilitate resource recovery and conservation. 42 U.S.C. § 6902(a)(1). "[D]iscarded materials have value in that energy or materials can be recovered from them. In the recovery of such energy or materials, a number of environmental dangers can be avoided. Scarce land supply can be protected. The balance of trade deficit can be reduced. The nation's reliance on foreign energy and materials can be reduced...." 1976 U.S.C.C.A.N. at 6241.

The Hazardous and Solid Waste Amendments of 1984 increased RCRA's emphasis on recovery and recycling of hazardous wastes. In those amendments, Congress sought to "minimiz[e] the generation of hazardous waste and the land disposal of hazardous waste by encouraging process substitution, materials recovery, properly conducted recycling and reuse, and treatment." 42 U.S.C. § 6902(a)(6)). Moreover, Congress articulated as an objective "promoting the demonstration, construction, and application of solid waste management, resource recovery, and resource conservation systems." 42 U.S.C. § 6902(a)(10). Indeed, the Conference Report for the 1984 amendments underscored Congress' goal to replace land dispos-

---

**5.** Section 6903(5) of RCRA defines the term "hazardous waste" as follows:

(5) The term "hazardous waste" means a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—

(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or

(B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

al with advanced treatment, recycling, and incineration:

> [T]he Conferees intend that through vigorous implementation of the objectives of this Act, land disposal will be eliminated for many wastes and minimized for all others, and that advanced treatment, recycling, incineration and other hazardous waste control technologies should replace land disposal.

Conference Report No. 98–1133, 98th Cong., 2d Sess. at 80, *reprinted in* 1984 U.S.C.C.A.N. at pp. 5576, 5651; *ENSCO*, 807 F.2d at 744 (noting Congressional intent to encourage treatment in preference to land disposal of hazardous waste).

RCRA enlists the states and municipalities to participate in a "cooperative effort" with the federal government to develop waste management practices that facilitate the recovery of "valuable materials and energy from solid waste." 42 U.S.C. § 6902(a)(11). At the heart of this federal-state cooperation in hazardous waste regulatory enforcement is § 6929 of RCRA, the so-called savings clause. That section bars states and municipalities from imposing requirements "less stringent" than the federal provisions, but permits states to adopt "more stringent" provisions.[6] *See* 42 U.S.C. § 6929; 1976 U.S.C.C.A.N. 6238, 6269–70.

Congress' invitation in § 6929 to the states and political subdivisions to adopt their own hazardous waste regulations is not, however, unbounded. Consistent with *Hines* and its progeny, a state or local zoning ordinance affecting hazardous waste disposal, treatment, and recycling cannot imperil the federal goals under RCRA. The retention of local regulatory authority under § 6929 must be viewed within the parameters of RCRA's stated national objectives in § 6902(a)(6) to minimize the land disposal of hazardous waste by encouraging treatment, resource recovery, and recycling. In this regard, we deem it instructive that the savings clause of § 6929 speaks only in terms of saving to state and local authorities the power to im-

pose more stringent "requirements" and it does not vest in such authorities the power to ban outright important activities that RCRA is designed to promote—including recycling hazardous waste.

If a more stringent hazardous waste regulatory measure is hostile to the federal policy of encouraging hazardous waste treatment, recycling, and materials recovery in place of land disposal, some kind of analysis must take place to determine how severely such an ordinance actually interferes with the federal policy and to evaluate the importance of the local interests that the ordinance purportedly serves.

Although limited in number, the decisions considering § 6929's preemptive effect on local ordinances are instructive. In *ENSCO*, for instance, the Eighth Circuit held that, § 6929 notwithstanding, RCRA preempted a county ordinance that imposed an outright ban on the storage, treatment, or disposal of "acute hazardous waste." *ENSCO*, 807 F.2d at 745. There, as here, when a landowner announced plans to incinerate hazardous waste, the county responded by passing an ordinance to preclude such activity. *Id.* at 744. Relying on the *Hines* federal preemption formulation, the court reasoned that "[a] county cannot, by attaching the label 'more stringent requirements' or 'site selection' to an ordinance that in language and history defies such description, arrogate to itself the power to enact a measure that as a practical matter cannot function other than to subvert federal policies concerning the safe handling of hazardous waste." *Id.* at 745 (noting that RCRA's general objective is to favor hazardous waste treatment over land disposal and to minimize land disposal of such waste to the extent feasible).

Similarly, the Supreme Court of Louisiana held that RCRA preempted a parish ordinance's flat ban on hazardous waste disposal because "spotty ... parochial control" in the nature of a "stifling prohibition" would undermine RCRA's hazardous waste manage-

---

**6.** This provision mirrors clauses in the Clean Water Act, 33 U.S.C. § 1370, and the Clean Air Act, 42 U.S.C. § 7416, which likewise established the federal requirements as the floor for regulatory controls. *See, e.g., United States Steel Corp.*

*v. Train*, 556 F.2d 822, 830 (7th Cir.1977) (Clean Water Act preserves for the States the right to impose limitations and standards more stringent than federal regulations promulgated under the Act).

ment goals. *Rollins Envtl. Servs. of La. v. Iberville Parish Police Jury,* 371 So.2d 1127, 1132 (La.1979). In facts virtually mirroring those in *ENSCO,* the parish imposed the ban against hazardous waste disposal on the heels of a company's acquisition of a deep well disposal facility in the parish. The court reasoned that RCRA preempted the ban because, otherwise, neighboring parishes would adopt similar bans, the cumulative effect of which would be to cripple RCRA's national objectives. *Id.; see also Jacksonville v. Arkansas Dept. of Pollution Control and Ecology,* 308 Ark. 543, 824 S.W.2d 840, 842 (1992) (holding that RCRA preempted the City of Jacksonville's ordinance from barring the incineration of hazardous waste that was not already located at a preexisting incineration plant before the ordinance was enacted, because the local measure frustrated RCRA's "preference for treatment rather than land disposal of hazardous waste"); *Hermes Consol., Inc. v. People,* 849 P.2d 1302, 1311 (Wyo. 1993) ("[A]lthough [§ 6929] allows states to adopt more stringent regulations, it does not authorize them to defeat safe federal solutions.... [or] to directly subvert RCRA and [EPA] decisions by outright bans on activities federal authorities considered safe.") (quoting *People v. Teledyne, Inc.,* 233 Ill. App.3d 495, 174 Ill.Dec. 688, 693, 599 N.E.2d 472, 477 (1992)).

In a case that did not involve an express ban, one court nevertheless held that RCRA preempted a city's conditional use permit scheme that, by failing to specify the requirements for obtaining such a permit, preserved unbridled discretion for local lawmakers to deny permits at will. *See Ogden Environmental Services v. City of San Diego,* 687 F.Supp. 1436, 1446–47 (S.D.Cal.1988). In *Ogden,* the landowner obtained an EPA permit to operate a hazardous waste incinerator at its existing facility in San Diego. *Id.* at 1437–38. In response, the San Diego City Council enacted an ordinance requiring a municipal permit for the incinerator. However, the ordinance did not delineate the prerequisites to qualifying for the municipal permit. The City then denied the landowner's permit application. *Id.* at 1440–41. Employing the *Hines* preemption analysis, the court held that § 6929 did not save San Diego's hazardous waste ordinance. *Id.* at 1448.

Inasmuch as San Diego's standardless permit scheme empowered City officials to impose a de facto ban on hazardous waste storage facilities without "articulating specific health and safety concerns" to support such a policy, the ordinance frustrated RCRA's waste treatment research, development, and demonstration program objectives as well as RCRA's general objective to facilitate treatment in place of land disposal. *Id.* The *Ogden* court focused on the absence of specific standards in the ordinance and the absence of specific findings by the City supporting its local interests. *Id.* at 1446–47. Because San Diego "councilmembers did not articulate any specific health, safety or environmental concerns" to justify the local program, the court concluded that the City's denial of a hazardous waste treatment permit was impermissible under federal preemption principles. *Id.* at 1446–48. However, the court did not preclude the possibility that an ordinance with express guidelines tailored to address reasonable local conditions, and supported by legitimate findings of fact to justify the action denying the conditional use permit, might have survived federal preemption scrutiny. *Id.*

By contrast, the court in *LaFarge* upheld a local ordinance prohibiting a cement plant from burning HWFs if the plant is located within one-half mile of a residence. *LaFarge,* 813 F.Supp. at 508–12. The court concluded that the ordinance was a reasonable response to safety concerns that might arise from spills and did not amount to a complete ban on such activity. Hence, it fell within the range of local ordinances allowed under § 6929. As in *Ogden,* however, the court's preemption analysis turned in part on the rationality of Texas' purposes underlying its more stringent site requirements. *Id.* at 508–11.

Similarly, the court in *Upjohn* upheld a municipal ordinance requiring the storage of waste in an enclosed structure unless the zoning commission approves the site plan after considering the activity's impact on public health, safety, sanitation, and aesthet-

ics. *Upjohn,* 753 F.Supp. at 430–31. The court conducted an extensive review of how the local measure affected the implementation of RCRA and, specifically, whether it frustrated Congress' goals and purposes. *See also Old Bridge Chemicals,* 965 F.2d at 1296 (upholding New Jersey regulation requiring transporters of recyclable hazardous waste to label and identify the waste); *Hunt v. Chemical Waste Management, Inc.,* 584 So.2d 1367, 1381–82 (Ala.1991) (upholding Alabama's "Cap" provision, limiting the amount of hazardous waste that can annually be disposed of at certain commercial facilities, because it "is consistent with what the Congress had in mind when passing RCRA— reducing the amount of landfilled waste—and furthers, rather than frustrates the purpose of RCRA"), *rev'd on other grounds,* — U.S. ——, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992).

We draw from these cases several principles that inform our preemption analysis under RCRA. First, ordinances that amount to an explicit or de facto total ban of an activity that is otherwise encouraged by RCRA will ordinarily be preempted by RCRA.[7] *ENSCO,* 807 F.2d at 745; *Ogden,* 687 F.Supp. at 1446–47; *Jacksonville,* 824 S.W.2d at 842; *Rollins,* 371 So.2d at 1132. Second, an ordinance that falls short of imposing a total ban on encouraged activity will ordinarily be upheld so long as it is supported by a record establishing that it is a reasonable response to a legitimate local concern for safety or welfare. *LaFarge,* 813 F.Supp. at 508–12; *Upjohn,* 753 F.Supp. at

431; *Old Bridge Chemicals,* 965 F.2d at 1296–97. Significant latitude should be allowed to the state or local authority. However, if the ordinance is not addressed to a legitimate local concern, or if it is not reasonably related to that concern, then it may be regarded as a sham and nothing more than a naked attempt to sabotage federal RCRA policy of encouraging the safe and efficient disposition of hazardous waste materials.[8]

Consequently, some review of the local ordinance is required. In *ENSCO,* the Eighth Circuit suggested that the review focus on whether the local ordinance was a "good faith" adaptation of federal policy to local conditions. *ENSCO,* 807 F.2d at 745. The district court in our case picked up on that standard when it ruled that the Board's Ordinance "can surely be viewed as a permissible 'good faith adaptation of federal policy to local conditions.'" Order of August 4, 1992 at 7. However, it seems to us that the evaluation of the local ordinance should be conducted on an objective, rather than a subjective, basis. It is, after all, very difficult to determine the bona-fides of a collective legislative body where motivation may vary among the members of that body and where, in most cases, the motivations may be complex and easily disguised. Rather, we are on firmer footing if we utilize an objective approach, asking whether a legitimate local concern has been identified and whether the ordinance is a reasonable response to that concern. Of course, we must also exam-

---

7. We can, of course, envision situations where a total ban of such activity would not be preempted. For example, if the political entity consisted only of densely populated residential areas, and the hazardous waste activity in fact posed a significant threat to health or safety, a total ban could be upheld as a reasonable exercise of § 6929 delegation of authority to state and local authorities to adopt more stringent requirements, including regulations relating to site selection.

8. We note that our preemption analysis is similar to the EPA regulations governing the approval of State hazardous waste management programs under § 6926 of RCRA. 40 C.F.R. § 271.4. Pursuant to § 6926(b), "[t]he EPA may authorize states to 'carry out' their own hazardous waste programs 'in lieu of' RCRA and to 'issue and enforce permits for the storage, treatment, or disposal of hazardous waste' so long as the state

program" is not inconsistent with the federal minimum standards. *United States v. State of Colorado,* 990 F.2d 1565, 1569 (10th Cir.1993) (quoting 42 U.S.C. § 6926(b)), *cert. denied,* — U.S. ——, 114 S.Ct. 922, 127 L.Ed.2d 216 (1994). Section 271.4 of the EPA regulations define when a State program is not consistent with the federal program:

(a) Any aspect of the State program which *unreasonably restricts, impedes, or operates as a ban on the free movement across the State border of hazardous wastes* ... shall be deemed inconsistent.
(b) Any aspect of State law or of the State program which *has no basis in human health or environmental protections and which acts as a prohibition on the treatment, storage, or disposal of hazardous waste in the State* may be deemed inconsistent.
40 C.F.R. § 271.4 (emphasis added).

ine the impact of the local ordinance on the objectives of the federal statute because there can be no implied *Hines* preemption unless the local ordinance thwarts the federal policy in a material way.

■ In adopting an objective, rather than a subjective, analysis for our preemption review, we are following the lead of the United States Supreme Court. *See Gade,* —— U.S. at ——, 112 S.Ct. at 2387. In *Gade,* the Court considered whether the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 et seq. ("OSH Act"), and federal regulations promulgated thereunder, preempted Illinois statutes requiring the licensing of workers at certain hazardous waste facilities. The Court concluded that the OSH Act barred a State from "enforc[ing] its own occupational safety and health standards without obtaining the Secretary [of Labor's] approval." *Id.* at ——, 112 S.Ct. at 2383. Absent the Secretary's approval, the OSH Act "preempts all state 'occupational safety and health standards relating to any occupational safety or health issue with respect to which a Federal standard has been promulgated.'" *Id.* at ——, 112 S.Ct. at 2386 (quoting 29 U.S.C. § 667(b)). Conceding that it had not obtained the Secretary's approval, the Illinois Environmental Protection Agency nevertheless attempted to defend the state statutes against a federal preemption attack by arguing that the OSH Act loses its preemptive force "if the state legislature articulates a purpose other than (or in addition to) workplace health and safety." *Id.* at ——, 112 S.Ct. at 2386. The Court, however, flatly rejected this argument. "Whatever the purpose or purposes of the state law, preemption analysis cannot ignore the *effect* of the challenged state action on the preempted field." *Id.* at ——, 112 S.Ct. at 2387 (emphasis added). *See also Perez v. Campbell,* 402 U.S. 637, 651–52, 91 S.Ct. 1704, 1712, 29 L.Ed.2d 233 (1971):

> We can no longer adhere to the aberrational doctrine . . . that state law may frustrate the operation of federal law as long as the state legislature in passing its law had some purpose in mind other than one of frustration. Apart from the fact that it is at odds with the approach taken in nearly all our Supremacy Clause cases, such a doctrine would enable state legislatures to nullify nearly all unwanted federal legislation by simply publishing a legislative committee report articulating some state interest or policy—other than frustration of the federal objective—that would be tangentially furthered by the proposed state law. . . .

### C.

■ Guided by these federal preemption principles and our understanding of RCRA's overall legislative scheme, we turn to the language of the Rogers County Ordinance at issue in this case. Section 3.13.2, as amended and entitled "Industrial Waste Disposal/Recycling/Treatment," provides in pertinent part:

> An Industrial Waste Disposal/Recycling/Treatment Site shall not be less than one hundred sixty (160) acres in size and no other industrial waste disposal/recycling/treatment site shall be nearer than one (1) mile (5,280 feet) in any direction from the proposed industrial waste disposal/recycling/treatment site. The site will be as nearly square as possible.

> All operation of actual disposal/recycling/treatment site (sic) shall be confined to as near the center of the site as practical and in no case in violation of any Oklahoma State Department of Health Rules and Regulations or in violation of any other regulatory requirements. The operator of the . . . site shall own in fee both the land (surface) and the minerals. The operator shall file with the Planning Commission a comprehensive drainage spill protection plan which will clearly and specifically detail the permanent and emergency measures and permanent structures to be installed to protect the drainage area and all adjacent drainage areas from any contamination by industrial waste. . . .

> All industrial waste disposal/recycling/treatment sites shall be located a least one (1) mile from any platted residential subdivision.

Blue Circle contends that this Ordinance frustrates RCRA's objective to encourage re-

source recovery and recycling because no landowner within the Commission's geographical jurisdiction can satisfy all the site location requirements. Blue Circle notes that there is no existing 160–acre plot in the county, situated in an industrially-zoned region, whose boundaries are at least one-mile from any platted residential area. The Board responds by identifying three sites that hypothetically could be rezoned to accommodate hazardous waste disposal, recycling, or treatment; however, Blue Circle retorts that these sites are presently zoned flood plain and are clearly unsuitable for the storage and burning of hazardous waste and that it is therefore inconceivable that the sites would be rezoned to permit such activity. The Board further argues that, because landowners enjoy the opportunity to seek a variance from the zoning requirements, the ordinance does not serve as an absolute ban on hazardous waste.

This exchange merely serves to highlight how inappropriate summary judgment was on this record. There is a serious dispute over whether this ordinance imposes a de facto ban on the burning of HWFs in Rogers County. Blue Circle represents that it submitted to the district court affidavits of three expert witnesses stating that the Ordinance's site requirements are unreasonable, arbitrary and capricious, overbroad, unnecessary, and serve no rational purposes.[9] In response, the Board merely rests on a hypothetical, standardless possibility that, notwithstanding the Ordinance's specific site requirements, the Board might relent and allow such activity in the future, either by rezoning flood plain land or by granting a variance. This is not a sufficient response.

---

**9.** Because the Board does not dispute that this evidence was submitted to the district court, we accept Blue Circle's representation.

**10.** During discovery, Blue Circle requested the Board to identify any documents that address the "scope, necessity, or basis" for the Board's amendment to § 3.13.2. Board App. at 57. In response, the Board conceded that "[n]o such document exists." *Id.*

**11.** "The Congress shall have power ... [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes[.]" U.S. CONST. art. I, § 8, cl. 3.

*See, e.g., Ogden,* 687 F.Supp. at 1446–48 (a standardless permit scheme amounted to a de facto ban). Further, there is nothing in the record identifying what specific safety or health hazards the Board believes would be presented if Blue Circle were to burn HWFs at its cement facility. Nor is there any evidence in the record suggesting that the limits imposed by the Ordinance—such as a one-mile buffer zone, the one-hundred-sixty acre minimum plot size, and the requirement that the site be as nearly square as possible—bear any reasonable relation to a legitimate local concern.[10]

In conclusion, this record is quite inadequate to support summary judgment for the Board on the preemption question. There is a genuine dispute concerning whether this Ordinance is a reasonable response to protect a legitimate local concern or whether it is really a sham, with the purpose and effect simply of frustrating the policy of RCRA to encourage the recycling of hazardous waste and the safe use of HWFs. On remand, the parties must be permitted to develop a factual record addressing these issues.

## IV. The Commerce Clause

Blue Circle next alleges that the Ordinance violates the Commerce Clause of the U.S. Constitution by imposing an excessive burden on interstate commerce by effectively barring the use of HWFs within Rogers County.[11] The district court summarily rejected this challenge by concluding that the Ordinance promotes the health, safety, and welfare of the Rogers County community and is "devoid of economic animus toward out-of-state interests." Order of August 4, 1992 at 8.[12]

---

**12.** There can be no doubt that hazardous waste is an article of commerce. *Chemical Waste Management, Inc. v. Hunt,* —— U.S. ——, —— n. 3, 112 S.Ct. 2009, 2012 n. 3, 119 L.Ed.2d 121 (1992) ("The definition of 'hazardous waste' makes clear that it is simply a grade of solid waste, albeit one of particularly noxious and dangerous propensities."); *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dept. of Natural Resources,* —— U.S. ——, ——, 112 S.Ct. 2019, 2023, 119 L.Ed.2d 139 (1992) ("Solid waste, even if it has no value, is an article of commerce.").

### A.

 Blue Circle relies on "dormant" Commerce Clause principles in its attack on the Ordinance's constitutionality. The Commerce Clause not only expressly empowers Congress to regulate commerce among the states, but it also impliedly confines the states' power to burden interstate commerce. *Oregon Waste Systems v. Dept. of Env. Quality*, — U.S. —, —, 114 S.Ct. 1345, 1349, 128 L.Ed.2d 13 (1994). The "dormant" Commerce Clause operates in this latter capacity by denying "the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Id.; C & A Carbone, Inc. v. Town of Clarkstown*, — U.S. —, — – —, 114 S.Ct. 1677, 1682–83, 128 L.Ed.2d 399 (1994).[13]

The district court focused on that aspect of the dormant Commerce Clause that prohibits direct burdens on interstate commerce resulting from discrimination between local and interstate commerce. It is certainly true that a major part of the jurisprudence under the dormant Commerce Clause addresses discrimination against out-of-state commerce. *See, e.g., Oregon Waste Systems*, — U.S. at —, 114 S.Ct. at 1351; *Chemical Waste Management*, — U.S. at —, 112 S.Ct. at 2013–14. Indeed, "where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected." *Philadelphia*, 437 U.S. at 624, 98 S.Ct. at 2535 (citing as a prototypical example a state law that "overtly blocks the flow of interstate commerce at a State's borders"). "[S]uch facial discrimination invokes the strictest scrutiny of any purported legitimate local purpose and of the absence of nondiscriminatory alternatives." *Chemical Waste Management*, — U.S. at —, 112 S.Ct. at 2014 (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 337, 99 S.Ct. 1727, 1737, 60 L.Ed.2d 250 (1979)); *Wyoming v. Oklahoma*, — U.S. —, — – —, 112 S.Ct. 789, 800–02, 117 L.Ed.2d 1 (1992) (deeming facially discriminatory an Oklahoma statute requiring coal-

fired electric generating plants that produce power for sale in Oklahoma to burn a mixture of coal containing at least 10 percent Oklahoma-mined coal).

 However, the dormant Commerce Clause also prohibits a state or local "statute [that] regulates evenhandedly to effectuate a legitimate local public interest" if it imposes a burden on interstate commerce that is "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970); *see also C & A Carbone*, — U.S. at —, 114 S.Ct. at 1682 (explaining that the "two lines of analysis" under the dormant Commerce Clause consist of local measures that discriminate against interstate commerce and those that regulate evenhandedly but impose unreasonable burdens on interstate commerce). When interstate discrimination is not involved, we assess a dormant Commerce Clause challenge to a local measure under the *Pike* balancing test. Pursuant to the *Pike* test, "[i]f a legitimate local purpose is found, then the question becomes one of degree." *Pike*, 397 U.S. at 142, 90 S.Ct. at 847. The extent of the burden on interstate commerce that will be tolerated will depend on the "nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id.; Philadelphia*, 437 U.S. at 624, 98 S.Ct. at 2535. Legislation pertaining to public safety has long been recognized as an important local interest. *Pike*, 397 U.S. at 143, 90 S.Ct. at 848; *Fort Gratiot*, — U.S. at —, 112 S.Ct. at 2027. Moreover, we have held that "the person challenging a statute that regulates evenhandedly bears the burden of showing that the incidental burden on interstate commerce is excessive compared to the local interest." *Dorrance v. McCarthy*, 957 F.2d 761, 763 (10th Cir.1992).

### B.

 The Rogers County hazardous waste zoning ordinance operates evenhandedly be-

---

**13.** The Supreme Court has affirmed that the dormant Commerce Clause applies not just to State-imposed discrimination against, or burdens on, interstate commerce, but also to measures adopted by political subdivisions of the States that burden interstate commerce. *Fort Gratiot*, — U.S. at —, 112 S.Ct. at 2024.

cause it does not distinguish between hazardous waste generated within the County and hazardous waste generated outside the county. Its site conditions apply equally, regardless of the origin of the HWFs being burned and it confers no advantages on in-state entities seeking to store, treat, recycle, or dispose of HWFs as against out-of-state firms. Consequently, we must apply the balancing test set forth in *Pike*, rather than the more strict test reserved for statutes that explicitly, or by application, discriminate based upon the origin of the article of commerce. *Dorrance*, 957 F.2d at 763 (applying *Pike* test to assess the constitutionality of Wyoming's ban on the private ownership of big or trophy game animals because the ban applied both to in-state and out-of-state residents); *Old Bridge Chemicals*, 965 F.2d at 1294 (*Pike* test applicable because New Jersey's hazardous waste transportation regulations applied "evenhandedly to in-state and out-of-state companies").

 The district court focused solely on the purported motives of the Rogers County Commissioners and concluded that there was no "economic animus toward out-of-state interests." Once it reached this conclusion, the court erred by bypassing the balancing analysis required by *Pike*. The court's exclusive focus on animus against interstate interests neglected completely the role of the dormant Commerce Clause in prohibiting unreasonable incidental burdens on interstate commerce, even when there is no discriminatory animus involved against interstate commerce. This broader analysis requires the court to scrutinize (1) the nature of the putative local benefits advanced by the Ordinance; [14] (2) the burden the Ordinance imposes on interstate commerce; [15] (3) whether the burden is "clearly excessive in relation to" the local benefits; and (4) whether the local interests can be promoted as well with a lesser impact on interstate commerce. *Pike*, 397 U.S. at 142, 90 S.Ct. at 847. The record here is inadequate to support a summary judgment

for the Board on the dormant Commerce Clause challenge to the Ordinance. The putative local interest here is the health and safety of the County's residents from HWFs and their by-products after combustion. However, the mere "incantation of a purpose to promote the public health or safety does not insulate a state law from Commerce Clause attack. Regulations designed for that salutary purpose nevertheless may further the purpose so marginally, and interfere with commerce so substantially, as to be invalid under the Commerce Clause." *Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662, 670, 101 S.Ct. 1309, 1316, 67 L.Ed.2d 580 (1981) (plurality opinion).

Here, there is no evidence that the HWFs that Blue Circle proposes to burn, or the by-products of combustion of such HWFs, would present any significant health or safety hazard. There is no evidence that the Ordinance requirements are related in any reasonable way to any hazard that the HWFs might present. And, there is no evidence whether the County's local interest could be promoted as well in other ways with a lesser impact on interstate activity. Blue Circle represents, and the Board does not refute, that it presented evidence that the Ordinance's site requirements are excessive in relation to the putative local benefits. Not only did the court apparently fail to consider this evidence, but it also did not address the other factors in the *Pike* balancing test. Further, Blue Circle also suggests other evidence it would have introduced had it been given proper notice of the court's decision to enter summary judgment against it.

Because we conclude that the court erroneously failed to conduct the *Pike* analysis and Blue Circle has presented evidence creating material fact issues as to the Commerce Clause implications of the Ordinance, we reverse and remand for further proceedings consistent with this opinion.

---

**14.** As we have noted, health and safety interests are important local interests. *Pike*, 397 U.S. at 143, 90 S.Ct. at 848; *Fort Gratiot*, —— U.S. at ——, 112 S.Ct. at 2027.

**15.** *See Chemical Waste Management*, —— U.S. at ——, 112 S.Ct. at 2102; *Dorrance*, 957 F.2d at 764 ("[T]he Supreme Court has made clear that the extent of the burden on interstate commerce is a *key inquiry* under the *Pike* analysis.") (emphasis added).

## V. State Law Claims

Finally, Blue Circle appeals the district court's rejection of its state law challenges to the Ordinance. The court concluded that it would not be inequitable to subject Blue Circle to the amended Ordinance because Blue Circle did not enjoy a vested right in burning HWFs at its cement plant before the Board amended § 3.13.2. On appeal, Blue Circle has abandoned its vested rights theory, opting instead to reformulate its argument to allege that the Board acted inequitably by amending the Ordinance specifically to thwart Blue Circle's HWFs project. In addition, Blue Circle alleges that the amendment constituted an unlawful exercise of the Board's zoning power. We will consider these claims in turn.

### A.

 Blue Circle contends that the Board acted inequitably by amending § 3.13.2 in direct response to Blue Circle's initial complaint seeking a declaratory judgment that the original version of § 3.13.2 did not apply to hazardous waste recycling and after the company had invested approximately $200,-000 in its HWFs conversion project. The district court concluded that, absent a vested right, Oklahoma law requires a court to apply the law in effect at the time of review.

The district court, and Blue Circle in its appeal, devote considerable attention to the applicability of an unpublished 1992 opinion by the Oklahoma Supreme Court. *See In re Julius Bankoff*, 1992 WL 131940 (Nos. 69586, 78146), (Okla. June 16, 1992) ("*Bankoff I*"). However, since the submission of briefs and oral argument in the instant case, *Bankoff I*

has been withdrawn and superseded on re-hearing by *In re Julius Bankoff*, 875 P.2d 1138 (Okla. 1994) ("*Bankoff II*").[16] *Bankoff II* has not yet been released for publication in the permanent law reports, and until it so released, it is subject to revision or withdrawal. Pursuant to Rule 1.200(B)(E) of the Oklahoma Rules of Appellate Procedure, "unpublished opinions are deemed to be without value as precedent ... [and] shall not be considered as precedent by any court or in any brief or other material presented to any court, except to support a claim of res judicata, collateral estoppel, or law of the case."

Were it not for *Bankoff II*, Blue Circle would have no authority for its claim that the County's amendment to its Ordinance constituted an inequitable and actionable abuse of government power. Because under Oklahoma law neither the district court nor our court may rely upon *Bankoff II* due to its present status as an unpublished opinion, we must disregard that authority.

Blue Circle cites no Oklahoma case, and we have found none, holding that a landowner acquires an accrued property or vested right in an existing zoning regulation affecting his property. *See April v. Broken Arrow*, 775 P.2d 1347, 1352 (Okla.1989) (a landowner's "potential use of all property, under our system of government, is subordinate to the right of City's reasonable regulations, ordinances, and all similar laws....").

Even if we were to consider *Bankoff II*, we cannot say the district court in the instant case erred in finding Blue Circle's situation distinguishable. Blue Circle had not applied for a conditional use permit at the time of the

---

**16.** In *Bankoff II*, a landowner applied for a conditional use permit to develop a landfill. When the county board of adjustment denied Bankoff's application, he appealed to the state district court. The district court reversed the board's decision and the board appealed. With the appeal still pending, the county board of commissioners amended its zoning ordinance to provide that Bankoff's proposed landfill project was no longer a permissible use. The Supreme Court of Oklahoma affirmed the district court's judgment in favor of Bankoff on "equitable considerations."

The Court expressly did not determine whether the Board acted in bad faith in adopting the

amendment or whether Bankoff had a vested right to develop the landfill. Instead, the Court stated that "Bankoff had done everything legally required of him": the State of Oklahoma had approved the proposal; the district court had concluded that he qualified for a conditional use permit; the Health Department had issued a permit; and he had spent $800,000 on the project. The Court explained that "under the facts peculiar to this case it would be inequitable to give effect to the [zoning] amendment. *Our decision should be seen as a narrowly-construed exception based strictly on equitable considerations given the facts peculiar to this case.*" *Bankoff II*, 875 P.2d at 1143 (emphasis added).

amendment and thus it was not, as of that time, entitled to convert to HWF's use even under the original version of the Ordinance.[17] Whereas the trial court in *Bankoff II* ruled that Bankoff had complied with the statutory requirements for a conditional use permit and had obtained approval from the State, Blue Circle has obtained no such ruling or approval. Although Blue Circle had incurred some engineering and planning costs, it had not commenced physical modifications to its plant.[18] Further, it is not evident from the record that Blue Circle's expenditures were undertaken in justifiable reliance upon the expectation that it would obtain approval under the original Ordinance. It is the Board's position that the amendment merely clarified the interpretation that it believed should have been accorded to its Ordinance all along. And, during Blue Circle's extended dispute with the Board, Blue Circle was clearly on notice that its right to convert its cement plant to HWF's use was being contested. Under these circumstances, we cannot disagree with the district court's conclusion that what is now the *Bankoff II* standard for an equity action against the Board was not met.[19]

Thus, we affirm the district court's grant of summary judgment in favor of the Board on this claim.

**B.**

We turn finally to Blue Circle's allegation that the Board's amendment to § 3.13.2 constituted an unlawful exercise of police power. Blue Circle neither raised this issue in its amended complaint nor in its motion for summary judgment. In addition, the district court did not consider the claim. The sole reference to this argument in the record on appeal appears in an unsigned proposed pretrial order that does not show that it was ever filed in the district court.[20]

Accordingly, we adhere to the well-established rule that we "will generally not address issues that were not considered and ruled upon by the district court." *Farmers Ins. Co. v. Hubbard*, 869 F.2d 565, 570 (10th Cir.1989). "Exceptions to this rule are rare and generally limited to cases where the jurisdiction of a court to hear a case is questioned, sovereign immunity is raised, or when the appellate court feels it must resolve a question to prevent a miscarriage of justice." *Hicks v. Gates Rubber Co.*, 928 F.2d 966, 970 (10th Cir.1991). The rule is justified by: the unfairness that inures to the opponent if one party is allowed to argue an issue not raised before the trial court; the fact that such a practice would frequently require us to remand for additional evidence gathering and findings; the need for finality in litigation;

---

**17.** Blue Circle argues that it did not need to apply for a conditional use permit prior to filing suit challenging the validity of the zoning amendment because an application would have been futile. For this proposition, Blue Circle again relies exclusively on *Bankoff*, which stated that Oklahoma "law does not require one to do a vain or useless thing or to perform an unnecessary act to obtain relief to which one is otherwise clearly entitled." *Bankoff*, 1992 WL 131940 at *6 n. 15. However, in *Bankoff*, unlike here, the landowner had applied for a conditional use permit and the municipality denied it. Because the landowner in *Bankoff* unsuccessfully sought a conditional use permit, the court concluded that any effort to obtain a variance to the zoning amendment would have been futile. Footnote 15 in *Bankoff*, therefore, does not support Blue Circle's reliance on the doctrine of futility.

**18.** We make this observation only to distinguish the facts of the instant case from those in *Bankoff II*. In so doing, we are not stating that planning and other preparatory costs could not, under some circumstances, be considered in determin-

ing whether it would be inequitable to apply an amended zoning ordinance to a landowner who incurred costs in pursuit of a project that was permissible under the pre-amendment version of the zoning ordinance.

**19.** *Bankoff II* suggested that an action alleging inequity against a zoning board for changing its zoning regulations after a landowner has complied with the existing law and has commenced construction in reliance upon its qualification under existing law, requires evidence of "bad faith, delaying tactics, prejudice, or reliance." *Bankoff II*, 875 P.2d at 1142.

**20.** This Court ordinarily will decline to consider a claim in the absence of the appropriate documents in the record on appeal, since any discussion of such a claim would be speculation. *U.S. v. Vasquez*, 985 F.2d 491, 494 (10th Cir.1993). We have explained that the "appellant is responsible for insuring that all materials on which he seeks to rely are part of the record on appeal." *Id.* at 495.

and conservation of judicial resources. *Id.* at 970–71.

Blue Circle's claim does not fit into the narrow exceptions to this general rule. We therefore decline to consider this attack on the Board's amendment to § 3.13.2.

## VI. Conclusion

We REVERSE the district court's order of summary judgment regarding Blue Circle's federal preemption and Commerce Clause challenges to the Rogers County Ordinance and REMAND for consideration. We AFFIRM the court's summary judgment in favor of the Board on Blue Circle's equity claim.